ARTHUR W. HORSTMIER, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Horstmier v. Commissioner
Docket Nos. 5644-72, 9796-74, 6544-78, 8193-79.
United States Tax Court
T.C. Memo 1983-409; 1983 Tax Ct. Memo LEXIS 374; 46 T.C.M. (CCH) 738; T.C.M. (RIA) 83409; July 18, 1983; As Amended July 27, 1983 *374 Pursuant to P's request, P's brother executed a power of attorney appointing X to act as his lawful attorney in connection with the creation of a foreign situs trust with ABC Trust Co. as trustee. X, acting as the lawful attorney of P's brother, executed an irrevocable trust instrument, dated April 24, 1967, for the benefit of P, P's children, and P's grandchildren, which provided, inter alia, that P's brother, as trustor, had delivered to ABC Trust Co. $100 as the initial corpus of the trust. On May 1, 1967, X, acting as P's lawful attorney, executed an "Annuity Agreement" stating that P was contemporaneously transferring various assets to the trust in return for equal annual payments for life. Held: Based on all the facts and circumstances, P's transfer of his properties was not a sale in exchange for an annuity. LaFargue v. Commissioner,689 F.2d 845 (9th Cir. 1982), affg. in part and revg. in part 73 T.C. 40 (1979) distinguished. Held further: P is taxed on the payments he received. Held: P is not entitled to deduct $2,250 and $2,500 for interest purportedly paid to Anglo Dutch in 1968 and 1970, respectively, where he failed to prove that such amounts did not constitute nondeductible *375 transfers to the "trust." P's purported "repurchase" of his residence from AA was a sham and he, consequently, was not indebted to AA. Held: P is not entitled to deduct $1,500 for interest purportedly paid to AA, where there was no valid, existing indebtedness within the meaning of section 163. Held further: Respondent's disallowance of deductions claimed for depreciation of P's residence sustained. P issued checks to his attorney for $1,500 and $2,400 during the taxable years 1970 and 1971, respectively. Held: P failed to prove that any portion of such amounts is deductible under section 212(1) as an expenditure for the production or collection of income or under section 212(2) as an expenditure for the management, conservation, or maintenance of property held for the production of income. Held: P is not liable for the addition to tax for negligence provided by section 6653(a), for 1968, 1970, 1971, and 1974. Harry Margolis and Richard Gladstein, for the petitioner. John E. Lahart,Michael Neil Gendelman, and Neal O. Abreu, for the respondent. IRWIN
MEMORANDUM FINDINGS OF FACT AND OPINION IRWIN, Judge: In these consolidated cases respondent determined deficiencies in petitioner's *376 Federal income taxes and additions to tax as follows: Addition to Tax
Docket No.
Year
Deficiency
Sec. 6653(a) [1]
5644-72
1968
$18,606.24
$930.31
9796-74
1970
12,198.97
609.95
1971
9,352.15
467.61
6544-78
1974
26,313.21
1,315.66
8193-79
1975
8,764.69
The issues for decision are: (1) Whether the substance of certain transactions described herein is the creation of a trust that is entitled to be recognized for Federal income tax purposes; (2) If a valid trust was created for Federal income tax purposes, whether certain transactions between petitioner and the trust should be treated as transfers in trust with the income taxable to petitioner under the grantor trust provisions of sections 671 through 677 or as sales in exchange for an annuity with the payments received by petitioner taxable to him under section 72 and other applicable legal provisions; (3) Whether petitioner is entitled to interest deductions for payments to Anglo Dutch Capital Company of $2,250 and $2,500 for the taxable *377 years 1968 and 1970, respectively; (4) Whether petitioner is entitled to an interest deduction of $1,500 for a payment to Associated Arts for the taxable year 1970; (5) Whether petitioner is entitled to deductions for depreciation in the amounts of $200 and $266.67 for the taxable years 1970 and 1971, respectively; (6) Whether petitioner is entitled to deductions for payments of attorney fees of $1,500 and $2,400 for the taxable years 1970 and 1971, respectively; and (7) Whether petitioner is liable for the addition to tax provided by section 6653(a) for the years 1968, 1970, 1971, and 1974. A constitutional objection raised by petitioner was disposed of when the Court granted respondent's motion to strike paragraph 6 from the petitions filed in docket Nos. 6544-78 and 8193-79. [2] *378 FINDINGS OF FACT Some of the facts in these cases were stipulated. The stipulation of facts, supplemental stipulation of facts, second supplemental stipulation of facts, and the stipulated exhibits are incorporated herein by this reference. Petitioner resided at 4387 North West Avenue, Fresno, California, at the time of filing the petitions herein. Petitioner has continuously resided at that same address since 1958. Issues 1 and 2 - The Trust and Annuity
Richard J. Loughead (Loughead herein) and petitioner were friends and business acquaintances. In early 1967, Loughead introduced petitioner to Quentin Breen (Breen herein) or Harry Margolis (Margolis herein), California attorneys then practicing at the same law firm. Before May 1967, petitioner met with Breen and Margolis for advice regarding tax planning. *379 As a result of these discussions, petitioner decided to transfer property to a foreign situs trust [3] in exchange for an annuity. A part of the tax plan was the establishment of a foreign situs trust to receive the property. Since the plan provided for petitioner having a special limited power of appointment over the assets of the trust, Breen believed that certain tax disadvantages would result if petitioner were the settlor of the trust. Petitioner, therefore, asked his brother, Rudolph Horstmeier [4] (Rudolph herein), to establish the trust. Thereafter, on March 14, 1967, Rudolph executed a power of attorney appointing Godfrey Johnson his lawful attorney to act for him in connection with the creation of a foreign situs trust with Aruba Bonaire Curacao Trust Company Limited (ABC herein) as trustee. [5] At trial Rudolph *380 recognized his signature on the power of attorney. Yet, Rudolph had never heard of Godfrey Johnson and he knew nothing about ABC. Rudolph was unable to recall whether he had provided $100 as the initial corpus of the trust. Also on March 14, 1967, petitioner executed a power of attorney appointing Godfrey Johnson his lawful attorney to act for him in the creation of a private family annuity agreement to be entered into between petitioner and ABC, acting as trustee of a settlement theretofore established by Rudolph. Petitioner has never met Godfrey Johnson and knows nothing about him. Godfrey Johnson and ABC executed a trust agreement dated April 24, 1967. The trust agreement consisted of two parts, a general "Basic Trust Agreement" and a "Trust Agreement" with specific terms which modified portions of the basic agreement to fit the needs of petitioner. The specific portion of the agreement provided as *381 follows: TRUST AGREEMENT
THIS TRUST AGREEMENT is entered into this 24th day of April, A.D. 1967, by and between RUDOLF HORSTMIER [sic] of Fresno, California, as Trustor, and ARUBA BONAIRE CURACAO TRUST COMPANY LIMITED, as Trustee. Attached hereto and made a part hereof as if fully set forth herein is a "Basic Trust Agreement" consisting of an index and ten (10) pages of content. Said Basic Trust Agreement shall apply fully and in all respects except as specifically, by reference, hereinafter deleted, modified or otherwise rendered inapplicable. ARTICLE I
Trustor has delivered to Trustee the sum of $100.00 (ONE HUNDRED DOLLARS) as the initial corpus of this Trust. [The Court notes that there is no Article II or III.] ARTICLE IV
The beneficiaries of this Trust shall be ARTHUR W. HORSTMIER, brother of the Trustor, LOIS FARMER, niece of the Trustor, EARL HORSTMIER, nephew of the Trustor, DOUGLAS FARMER, CHARLES FARMER, DAVID FARMER AND MARK FARMER, children of the niece of the Trustor. Issue of any of the named beneficiaries shall themselves become beneficiaries immediately on birth. The term "issue" shall include anyone legally adopted by any of the named beneficiaries, effective *382 immediately upon the judicial confirmation of the parent-child relationship. Any legal spouse of any named beneficiary shall become a beneficiary upon marriage to such named beneficiary, for so long as such spouse remains a legal spouse. In addition to the persons named, all blood relatives of all beneficiaries may become beneficiaries as hereinafter provided. It is expressly understood that the interest of any person not specifically named herein shall come into being only within the terms of and by exercise of a special limited power of appointment as hereinafter provided except if there is no living person to whom a power of appointment has been granted as hereinafter provided, in which case all persons described shall become beneficiaries excluding only the Trustor herein. ARTICLE V
(5) A special limited power of appointment is hereby granted to ARTHUR W. HORSTMIER as to the total assets of the Trust. This special power of appointment shall take effect only on the death of ARTHUR W. HORSTMIER. This power may be exercised by Will or Deed. Should ARTHUR W. HORTMIER not exercise this special limited power of appointment, or should ARTHUR W. HORSTMIER, in exercising such special *383 limited power of appointment not prohibit the further exercise of any special limited power of appointment hereunder, then LOIS FARMER and EARL HORSTMIER shall each have a special limited power of appointment as to one-half of the trust corpus which shall extend to all aspects of this Trust but such power shall be exercised only after the death of ARTHUR W. HORSTMIER, and the exercise of such special limited powers of appointment by LOIS FARMER and EARL HORSTMIER shall take effect only on their respective deaths. LOIS FARMER and EARL HORSTMIER may exercise their respective special limited powers by Will or Deed. No further special limited power of appointment shall exist for any other beneficiary under this Trust except as such further special limited power of appointment shall have been created by ARTHUR W. HORSTMIER, LOIS FARMER, or EARL HORSTMIER in the exercise of their respective powers. The beneficiaries designated in Article IV of the Trust Agreement, aside from petitioner, are petitioner's children (Earl Horstmier and Lois Farmer) and petitioner's grandchildren (Douglas Farmer, Charles Farmer, David Farmer, and Mark Farmer). [6] *384 The basic trust agreement, to which the specific agreement was referenced, provided that the trust was irrevocable and unamendable and further provided, in pertinent part, as follows: ARTICLE IV
DESIGNATION AND DESCRIPTION OF BENEFICIARIES
The Beneficiaries of this Trust shall be set forth in the Instrument of which this is a part. The Trustor is expressly excluded, both directly and indirectly, from becoming a Beneficiary. Any children who may hereafter be born, who come within any of the definitions of Beneficiaries hereunder, shall be included as additional Beneficiaries. The respective interests, whether immediate, contingent or potential of each of such named or described Beneficiaries hereunder shall be as set forth hereinafter. ARTICLE V
PROVISIONS RE ACCUMULATION AND DISTRIBUTION
This Trust is in part an accumulation Trust, and *385 in part for current distribution of income and corpus. Distributions, and matters relating thereto, shall be governed as set forth in the total Trust Instrument. (1) Currently Taxable Income
All income of every kind and character which is taxable as current income at the time of its earning or receipt to either the Trust or any Beneficiary or party hereunder under the income tax laws of any national state, shall be distributed to the Beneficiary or party against whom the income tax has been assessed, provided only that no additional tax shall result from such distribution. Income which is currently taxable to the Trust shall be distributed to the Beneficiaries, as provided elsewhere herein, provided only that such distribution shall not result in additional income tax. Should the Trustor or any subsequent Donor be taxed in any way in any connection with this Trust, the corpus or income which is taxable to such Trustor or Donor shall be returned to such Trustor or Donor, and such gift or income from a gift shall be treated as if the corpus had never been contributed to the Trust in the first instance. (2) Corpus and All Other Income
Corpus and all currently nontaxable income shall *386 be accumulated during the lifetime of every named Beneficiary of this Trust and for a period not to exceed twenty-one (21) years after the death of such last named Beneficiary. Should any Beneficiary be able at any time during the life of this Trust to establish to the satisfaction of the Trustee that any portion of corpus or income may be distributed to such Beneficiary without such Beneficiary or the Trust incurring taxation of any kind or character under the tax laws of any national state, the Trustee shall in such event distribute to such Beneficiary so much of the corpus or income as the Trustee in its exclusive discretion determines to be necessary in relation to the education, support, maintenance and health, or to the maintenance for any such Beneficiary of his or her accustomed standard of living. Such decision shall be made by the Trustee in the light of the over-all situation of all Beneficiaries living at the time in question and, in cases of need, within these standards, the Trustee may utilize any or all of the Trust assets, and no precept of equality need apply. Should the Trustee, under this provision, distribute the entire corpus and income of the Trust in any one *387 year, when that is possible, the Trust shall then be terminated. (3) Emergencies
The foregoing provisions express collectively the mode, manner, terms and conditions intended to govern the distribution of all corpus and income of the entire Trust hereby established under normal circumstances and conditions. Emergencies and conditions of special need, however, constitute special categories not contemplated under such foregoing provisions and not intended to be governed thereby and which shall be separately and specially governed as provided below. The additional powers given the Trustee under conditions of emergency are intended to be limited to such special emergency circumstances but, in such special emergency circumstances, shall supersede and prevail over any other provision set forth in this Trust. The Trustee shall have the power and is instructed to depart from the program set forth above in any emergency for any Beneficiary of the Trust hereby established. Trustor intends here to rely on the mature judgment of an experienced Trustee activated by the best interests of all of the Beneficiaries. In any such emergency, the Trustee should do anything and everything to assist *388 the necessit ous Beneficiary affected and should make any distributions of income or corpus, or both, from the Trust hereby established, which Trustee, in its sole judgment, in the premises may deem advisable. Action, even to the full consumption of the entire Trust, in any manner, shall be taken if the emergency requires it. Equality among the Beneficiaries is of little consequence in an emergency. (4) Special Needs
In the absence of any emergency, any Beneficiary may apply to the Trustee in writing to request distribution of corpus or income upon the basis that such corpus or income is necessary to the Beneficiary in relation to education, support, maintenance and health, or to enable any such Beneficiary to maintain his or her accustomed standard of living. In cases of need, within these standards, the Trustee may utilize any or all of the Trust assets, and no precept of equality need apply, provided only that the Trustee shall in its sole judgment determine that such distribution of corpus or income is then consistent with the general interests of the Trust and all of the Beneficiaries. ARTICLE VII
GENERAL PROVISIONS RE TRUSTEE AND TRUSTEE POWERS
(A) SPECIFIC *389 TRUSTEE-POWER PROVISIONS
(3) Trustee's Power to Determine Principal and Income
The Trustee shall have full power and authority to determine, in its absolute discretion, what shall constitute principal of the Trust estate, gross income therefrom, and net income distributable under the terms of this Trust, except as herein otherwise specifically provided, and the determination of the Trustee with respect to all such matters shall be conclusive upon all persons howsoever interested in this Trust. (11) Requirement for Keeping of Records
The Trustee shall be responsible for maintenance of adequate records showing the condition of the Trust estate and the income and expenses thereof, and for the preparation of all required accountings. The records pertaining to the Trust shall be open at all reasonable times to inspection by the Trustor, by any Beneficiary of any Trust, or by the representatives of any such person; and any such person shall have the right to demand annual accountings showing the administration of the Trusts. If Trustor is alive, the Trustee may report to him in lieu of responding to the inquiry of any other Beneficiary under this Section No. 11. Should Trustor be deceased, *390 the Trustee shall not be required to report to more than three (3) Beneficiaries in any one calendar year. This provision is made necessary by the fact that there could be a large number of Beneficiaries who could unduly burden the Trustee. (18) Nonliability of Trustee
The Trustee shall not be liable for any act or omission in connection with the administration of any of the Trusts, or in the exercise of any powers hereunder, or for any loss of or injury to any properties held in Trust, except only for its own actual fraud. The judgment of the Trustee on matters placed by this Trust instrument within its discretion shall be final and conclusive on Trustor and on all persons interested, or who may become interested, in the Trusts herein created. Acting pursuant to the power of attorney granted him by petitioner, Godfrey Johnson executed on petitioner's behalf an instrument entitled "Annuity Agreement" on May 1, 1967. The agreement stated that ABC was entering into the annuity agreement on behalf of Trust Settlement No. 231 (the trust purportedly created by Rudolph). It further stated that, contemporaneously with the execution of the agreement, petitioner assigned, transferred *391 and set over to ABC the following assets: BASIS
VALUE
Cash in various savings and
loan accounts
$100,584.79
$100,584.79
Note receivable, Santa Fe Arms,
Fresno, California
112,245.23
112,245.23
Cash to be delivered to trust
no later than 31st December
1967
25,000.00
25,000.00
The East half of Lot 1165 and
an undivided two-thirds (2/3)
interest in Lot 1166 and in
the West one-half of Lot 1165
Bullard Lands Irrigated Subdivision #7
22,500.00
93,000.00
The North 1/2 of the Southwest
1/4 of the Northwest 1/4 of
Section 35, Township 13 South,
Range 19 East, MDB&M, EXCEPTING
THEREFROM all oil, gas and
mineral rights located therein
and thereunder as provided in
the Deed from Albert Gefvert
also known as C. A. Gefvert to
Anna Gefvert and Elizabeth G.
Tyler [the "Gefvert Properties"
herein]
25,000.00
40,000.00
Lots 2 to 4 inclusive and Lots
24 to 26 inclusive, of Block
28 of CAMBRIDGE PINES, [the "Cambria Properties" herein]
6,000.00
6,000.00
Lots 15, 17 and 32 of HORSTMIER
TRACT #2, [the 'Horstmier Properties" herein]
3,000.00
$291,330.02
$379,830.02 For purposes of this case only, the parties have stipulated that, as of May 1, 1967, the property listed above had a total fair market value of $379,829.62 and a total basis to petitioner *392 of $291,330.02. In exchange for the transfer of petitioner's property to ABC, ABC promised to pay petitioner $1,872.92 monthly. On May 1, 1967, petitioner's actuarial life expectancy was 16.9 years. If petitioner were to live exactly that long he would receive $379,828.18 in annuity payments. Other pertinent terms of the annuity agreement are set out below: 3. The sole consideration for the transfer of these certificates and assignment of these interests is this present Annuity Agreement. There is no independent security for this Annuity Agreement. 4.ABC agrees to pay to HORSTMIER the sum of ONE THOUSAND EIGHT HUNDRED AND SEVENTY-TWO DOLLARS and 92/100 ($1,872.92) on 1st May 1967, and ONE THOUSAND EIGHT HUNDRED AND SEVENTY-TWO DOLLARS and 92/100 ($1,872.92) on the first day of each succeeding month for life. The amount payable to Horstmier shall lapse on death. The sum of TWENTY TWO THOUSAND FOUR HUNDRED AND SEVENTY-FIVE DOLLARS AND 12/100 ($22,475.12) per year is calculated upon the following basis: that the fair market value of the assets and interests described in Exhibit 'A' attached hereto is THREE HUNDRED AND SEVENTY-NINE THOUSAND EIGHT HUNDRED AND THIRTY DOLLARS and *393 02/100 ($379,830.02) and that the life expectancy of a 62 year old male is 16.9 years. 5. The parties expressly recognize that, under the Internal Revenue Code of the United States, this valuation, taking into account the life expectancy figure set forth above, will establish a cost for the Annuity of THREE HUNDRED AND SEVENTY-NINE THOUSAND EIGHT HUNDRED AND THIRTY DOLLARS AND 02/100 ($379,830.02). The expected return from the Annuity for the 16.9 year life will be identical with such cost and that, therefore, the TWENTY TWO THOUSAND FOUR HUNDRED AND SEVENTY-FIVE DOLLARS AND 12/100 per year ($22,475.12) will be excluded from gross income by HORSTMIER until a total of TWO HUNDRED AND NINETY-ONE THOUSAND THREE HUNDRED AND THIRTY DOLLARS and 02/100 ($291,330.02) has been recovered, and thereafter such sum will be capital gain until THREE HUNDRED AND SEVENTY-NINE THOUSAND EIGHT HUNDRED AND THIRTY DOLLARS and 02/100 ($379,830.02) has been recovered. 7. The parties do not intend any gift by HORSTMIER to ABC or by ABC to HORSTMIER. The parties agree that they each have received full value. 8. This Agreement shall terminate in all events on the death of HORSTMIER; no guaranteed payout *394 is provided for under this Annuity Agreement. 9. No security of any kind has been reserved for this Annuity Agreement, and it is understood that ABC has full right to dispose of this property or otherwise deal with it in any way it wishes without any consultation with, or responsibility to, HORSTMIER. 10.The TWENTY-TWO THOUSAND FOUR HUNDRED AND SEVENTY-FIVE DOLLARS AND 12/100 ($22,475.12) payment required hereunder shall be made on or before the 31st December of each calendar year.Default in any payment by ABC to HORSTMIER shall carry six per cent (6%) interest from the date on which the payment was due. * * * Although payment of the annuity was scheduled to commence on May 1, 1967, petitioner received no annuity payments from ABC during 1967. From 1968 until September 6, 1974, petitioner received checks drawn on an account of ABC maintained at Irving Trust of New York or Barclays Bank of New York. Most payments were monthly. On occasion, Breen issued a check from his office account and then sought reimbursement from ABC. Commencing on November 3, 1974, petitioner received checks drawn by Alexia Trust Company on an account at Barclays Bank of San Francisco. With these checks, *395 petitioner received a transmittal indicating that the checks were issued on behalf of ABC. From 1968 through 1975, petitioner received the following amounts: Year
Received From
Amounts
1968
ABC Trust Company
$37,458.50
1969
ABC Trust Company
22,475.04
1970
ABC Trust Company
20,602.12
1971
ABC Trust Company
22,475.04
1972
ABC Trust Company
16,856.28
1973
1974
ABC Trust Company
22,000.00
1974
Alexia Trust Company
26,696.08
1975
Alexia Trust Company
21,602.12
Petitioner received no interest from ABC in connection with the untimely 1967, 1972, and 1973 payments, although the annuity agreement provided for interest. In order to keep track of a client's affairs, Margolis and his associates made use of what was called a "memorandum accounting" or a "system accounting." Transactions relating to a particular client and the trust with ABC established by that client would be recorded in chronological order on a single page. A partial [7] system accounting for petitioner entitled "#231 Horstmier," reflecting transactions from November 25, 1968, to March 10, 1970, was introduced into evidence in the present case. (See pp. 36-39, infra.) The annuity payments received by petitioner during that period were treated as amounts *396 "paid out." On his Federal income tax return for 1968, petitioner reported no income from the annuity payments, but in an attached schedule stated: Annuity Income
On May 1, 1967, taxpayer transferred property valued at $379,829.62 in return for a private annuity of $22,475.12 per year for life based on an actuarial life expectancy of 16.9 years. Taxpayer elects to report only such installments as may actually be received by him and further elects to apply all amounts received to basis until the full basis shall have been recovered. All of the property had been held for more than six months and had a basis to the taxpayer of $291,330.02 Amounts Received
1967
1968
$37,458.50 Essentially identical statements were appended to petitioner's income tax returns for 1970, 1971, 1974 and 1975. The statement was prepared by Breen. Pursuant to the annuity agreement, petitioner was to transfer savings and loan accounts in the total amount of $100,584.79 to ABC. The accounts were to be transferred by petitioner to Continental *397 Title Company (Continental herein), who purportedly was to then remit the proceeds to ABC. Before the accounts were transferred to Continental, they earned interest totaling $6,666.67. In implementing tax plans for their clients, Margolis and his associates used "planning memoranda." These memoranda usually instructed whoever was to play a role in the plan (e.g., the client, the accountant, other attorneys, or the trust company) to enter into certain agreements or to move money in certain ways. Sometimes the memoranda would include suggested drafts of correspondence and of agreements required for the transactions in the tax plan. Insofar as petitioner's tax planning is concerned, one planning memorandum used by Breen directed Lee Neuhaus (Neuhaus herein), the president of Continental, to generate two letters addressed to Elaine B. Fischel (Fischel herein) "to confirm" what had happened when Continental transferred petitioner's accounts. (Fischel is a California attorney who then practiced at the same law firm as Breen and Margolis.) The memorandum, prepared by Breen on July 31, 1967, read, in part, as follows: July 31, 1967 HORSTMIER - CONTINENTAL
Dear Lee: We should have a couple *398 of letters for the record. First will be a letter to go along with the check for $107,251.06 sent to Elaine B. Fischel for the account of ABC: May 11, 1967 Elaine B. Fischel, Esq., 4032 Wilshire Blvd., Los Angeles, California
Dear Miss Fischel: Enclosed please find our check for $107,251.06 which we are delivering to you pursuant to the request of The Aruba Bonaire Curacao Trust Company Limited. We are delivering it to you for the account of ABC. ABC requested us to indicate to you the exact amounts of each account on closing. * * * I hope that this provides the information you need. The additional amount represents interest on the above accounts.
Sincerely yours, CONTINENTAL TITLE CO. BY Lee Neuhaus, President cc: Aruba Bonaire Curacao Trust Company Limited And one more letter: May 24, 1967 Elaine B. Fischel, Esq. 4032 Wilshire Blvd. Los Angeles, California
Dear Miss Fischel: Enclosed herewith is our check for $6,666.67 which represents the proceeds from the escrow presently being handled by us on behalf of The Aruba Bonaire Curacao Trust Company Limited. We are forwarding it to you at ABC's request with the understanding that you are holding funds for ABC's account. Sincerely *399 yours, CONTINENTAL TITLE CO. By Lee Neuhaus, President cc: Aruba Bonaire Curacao Trust Company Limited Quentin L. Breen, Esq. Cordinally yours, QUENTIN L. BREEN
Pursuant to Breen's instructions, Neuhaus sent a substantially verbatim copy of each letter to Fischel. Although the letters were dated May 11, 1967, and May 24, 1967, in accordance with Breen's memorandum, they were actually sent after July 31, 1967. In fact, Continental never transmitted a check for $107,251.06 to Fischel. Although Continental did draw a check, dated May 23, 1967, payable to "Elaine Fischel, Trustee" in the amount of $6,666.67, Fischel never received that check and did not recognize the endorsement on the back of the check. On or about May 12, 1967, Fischel did receive a check for $100,584.39 from Continental, drawn on its account, which she deposited to an account at Union Bank designated "Elaine Fischel, Client's Trust Account No. 2." Fischel did not disburse any of the proceeds of that check to ABC. A letter, signed by Neuhaus, was sent to Fischel with the check for $100,584.39 stating, "As *400 per instructions from Harry Margolis we are enclosing our check for $100,584.39 made payable to you as Trustee." Neither the letter nor the check mentioned any connection between the check and a trust of which ABC was trustee. The "Note receivable, Santa Fe Arms, Fresno, California," which petitioner was to transfer to ABC pursuant to the annuity agreement, was a deed of trust note received as partial consideration for certain real property, known as the Santa Fe Arms property, sold on December 30, 1965, by petitioner to Loughead and his wife. The note, secured by a deed of trust on the Santa Fe Arms Property, was in the face amount of $123,956.26 and provided for interest on the unpaid principal at the rate of 7 percent per annum, with principal and interest payable in monthly installments of $876.68 beginning on February 1, 1966. On April 25, 1967, petitioner assigned the deed of trust together with the note to ABC. (The assignment of the deed of trust was recorded in the Fresno County recorder's office on August 6, 1968.) On April 30, 1967, the principal amount due on the note was $112,245.23. Despite the assignment, throughout the remainder of 1967, the Lougheads continued *401 to make monthly payments to petitioner. Under the tax plan arranged for petitioner by Breen and Margolis, payments on the deed of trust note were to be paid to Anglo Dutch Capital Company (Anglo Dutch herein), purportedly pursuant to a collection agreement between Anglo Dutch and ABC. (Anglo Dutch was a California corporation owned by Margolis and one of his employees, Walter Joe.) In 1968, petitioner transferred $7,029.44, which he had purportedly collected for ABC, to Anglo Dutch. From at least December 26, 1968, through March 10, 1970, monthly payments on the deed of trust note of $878.68 were made by the Lougheads to Anglo Dutch and were reflected on the partial system accounting as amounts "paid in." By a deed dated May 13, 1949, and recorded September 2, 1952, petitioner's mother, Emma Horstmeier, had conveyed lots 1165 and 1166 of Bullard Lands Irrigated Subdivision No. 7 to petitioner's sister, Edna Horstmeier (Edna herein). Thereafter, by a grant deed dated March 5, 1960, and recorded on April 5, 1960, Edna conveyed the east one-half of lot 1165 to petitioner. By quitclaim deeds, dated December 15, 1966, Edna conveyed to petitioner and Rudolph an undivided one-third interest *402 in lots 1165 and 1166 each. In late 1966, Rockie Gamber (Gamber herein), a home developer, indicated his interest in purchasing the Bullard Lands properties held by Edna, Ruldolph, and petitioner. He approached Edna and petitioner, offering to pay $100,000 for the properties, not including that portion of lot 1165 containing petitioner's residence. Edna and petitioner accepted Gamber's offer. Lots 1165 and 1166 of Bullard Lands Irrigated Subdivision No. 7, excluding petitioner's residence and the land surrounding it, ultimately were conveyed to Gamber for $100,000 as follows.On or about December 27, 1966, Rudolph and petitioner established an escrow with Continental. On December 27, 1966, grant deeds were executed by Rudolph and petitioner, whereby each transferred his respective interest in lots 1165 and 1166 to Continental. Petitioner excepted from his grant deed that portion of lot 1165 on which his residence is situated.Edna conveyed her interest in lots 1165 and 1166 to Gamber and his wife by a grant deed executed on March 6, 1967. In consideration therefor, the Gambers executed a deed of trust in favor of Edna to secure a promissory note for $25,000. Thereafter, on May *403 10, 1967, the interest in lots 1165 and 1166 held by Continental was conveyed by it to Gamber and his wife. As partial consideration therefor, the Gambers, on April 24, 1967, executed a deed of trust in favor of ABC to secure a note in the amount of $73,150. All the foregoing deeds and deeds of trust were recorded on May 12, 1967. On August 25, 1967, Neuhaus sent Fischel a check for $74,600.82, representing the proceeds received by Continental from the Gambers for lots 1165 and 1166. On August 28, 1967, Fischel deposited that check to the account entitled "Elaine B. Fischel, Client's Trust Account No. 2." Under the terms of the May 1, 1967, annuity agreement, petitioner was to transfer his interest in the Gefvert Properties, the Cambria Properties, and the Horstmier Properties to ABC. Under the tax plan arranged for petitioner by Breen, petitioner's interests in the Gefvert, Cambria, and Horstmier Properties were to be deeded to Continental to hold pursuant to a holding agreement for ABC. Petitioner purported to convey his interest in the Gevert, Cambria, and Horstmier Properties to Continental by grant deeds as follows: Date of
Date Deed
Properties
Deed
Recorded
Gefvert & Horstmier
May 1, 1967
June 18, 1971
Cambria
May 1, 1967
January 16, 1969
Pursuant *404 to a holding agreement dated May 1, 1967, Continental purportedly held the Gefvert, Cambria, and Horstmier Properties for ABC. Under a second holding agreement, dated January 1, 1968, Continental purportedly held the Gefvert, Cambria, and Horstmier Properties for Universal Decoration Leasing (UDL herein), a California corporation. (Fischel incorporated UDL and served as its secretary-treasurer. UDL was used in connection with transactions planned by Margolis for his clients. From 1967 to 1971, its operations were reviewed by two attorneys: Ben Margolis (Harry Margolis' brother) and John McTernan.) Under a third holding agreement, dated May 19, 1970, Continental purportedly held the Gefvert Properties, the Horstmier Properties, and lots 2 to 4 of the Cambria Properties for West Bay Investors, a partnership.(In 1968 lots 24 to 26 of the Cambria properties had been disposed of by UDL as hereafter described.) The first holding agreement dated May 1, 1967, and the deeds dated May 1, 1967, were actually written sometime after May 1, 1967. On May 9, 1967, before leaving California to spend four weeks in Europe, Breen wrote a memorandum to Neuhaus which read, in part, as follows: I anticipate *405 transferring all of Arthur Horstmier's real property by deed to Continental Title Company to hold under Holding Agreement for the benefit of Aruba Bonaire Curacao Trust Company Limited. In view of the fact that the California State Bar prevailed in preventing Title Companies from doing what they do better than attorneys, namely drafting Holding Agreements, I will draft the Holding Agreement so that you will not have that responsibility. However, in order to do so, I will need the legal descriptions of all the properties in that big cardboard box that Arthur apparently delivered to you. I will also need Deeds conveying the property to Continental Title. The date of the Deeds should be after April 24, and before the date of the escrow pursuant to which the Horstmier property was sold, on the deal which I believe closed recently. As long as there is going to be no activity (other than he savings account passbooks which Harry has already taken care of) I see no reason why we cannot complete this upon my return June 6. * * * After petitioner purportedly had transferred the Gefvert Properties to Continental to hold for ABC, he leased the Gefvert Properties to Leo Bridge, received the *406 rent therefrom, and paid the real property taxes thereon. By a grant deed executed February 22, 1977, Continental transferred the Gefvert Properties to Ruth G. Vander Schel. As partial consideration therefor, Ruth G. Vander Schel executed a deed of trust note in favor of ABC. Loughead and Robert Mitchell, an attorney associated with Margolis, purportedly represented ABC, as seller, in connection with the disposition of the Gefvert Properties.The latest holding agreement in evidence, dated May 19, 1970, provided that Continental was holding the Gefvert Properties for West Bay Investors, not ABC. By a grant deed, dated August 19, 1968, and recorded January 16, 1969, Continental conveyed lots 24, 25 and 26 of the Cambria Properties to Jack Samms (Samms herein). When Samms purchased lots 24, 25, and 26, he made a downpayment to petitioner, although those lots purportedly were held by Continental pursuant to a holding agreement for UDL. As partial consideration for those lots, Samms also executed a deed of trust note for $2,250, payable to UDL. However, Samms made payments on the note to petitioner. On accounting work sheets he maintained, petitioner designated these payments as *407 "Collected for Univ. Decorating." On July 23, 1969, Samms and his wife conveyed lots 24, 25, and 26 to Michael and Ellen Crill. Upon his disposition of the lots, Samms agreed to pay the balance due on the note payable to UDL. In this connection, the title company handling the escrow for the transaction requested a beneficiary's demand for payment from Fischel, as secretary-treasurer of UDL. Thereafter, the title company transferred to UDL the payment in the amount of $2,042.38 that Samms had made to discharge the obligation evidenced by the note and interest thereon. That payment is reflected as an amount "paid in" on the partial system accounting submitted into evidence. By a grant deed dated September 23, 1975, and recorded September 29, 1975, Continental conveyed lots 2, 3, and 4 of the Cambria Properties to Larry and Carolyn Pitts. The gross price of the sale to Mr. and Mrs. Pitts was $9,000. After deducting certain costs from the $9,000 price, Continental remitted the net sale proceeds of $7,824.88 to West Bay Investors. Although on May 1, 1967, petitioner purportedly conveyed his interest in lots 17 and 32 of the Horstmier properties to Continental to hold for ABC, he *408 continued to pay the real property taxes on those lots and he granted easements to the County of Fresno on lots 32 and 17 by grant deeds dated December 10, 1970, and January 6, 1971, respectively.Furthermore, on March 2, 1971, petitioner sold lots 17 and 32 to Paul E. Moen (Moen herein) for $4,500. The net proceeds from the sale, $3,992.19, were deposited to petitioner's personal bank account. Although petitioner testified that he considered the proceeds from the sale to Moen to be the trust's money, there is no evidence indicating that he reimbursed the trust. By a grant deed signed personally by petitioner on March 2, 1971, the titles to lots 17 and 32 were transferred to Moen. Thereafter, the titles to both lots 17 and 32 were transferred between a number of third parties. Meanwhile, on June 18, 1971, Continental recorded the grant deed to it of lots 17 and 32, resulting in a cloud on the titles. To remove the cloud on lot 17's title, on December 4, 1978, Continental without consideration recorded a deed granting lot 17 to Angelo Pecora and his wife. Prior to entering into the annuity agreement with ABC, petitioner promised his daughter, Lois Farmer (Lois herein), to convey *409 lot 15 of the Horstmier Properties to her as a wedding gift. Since petitioner felt that Lois and her husband were not financially responsibile, he had a grant deed conveying lot 15 to Lois prepared, but did not execute it. Notwithstanding the promise he had made to Lois, petitioner agreed to transfer lot 15 of the Horstmier Properties to ABC pursuant to the annuity agreement and by a grant deed dated May 1, 1967, petitioner conveyed the legal title thereto to Continental to be held for ABC. On September 15, 1967, petitioner executed the grant deed conveying lot 15 to Lois. The deed to Lois was recorded on September 21, 1967. On February 20, 1968, Lois conveyed the title to lot 15 to Henry R. Hopson and Donna K. Hopson. Thereafter, the title to lot 15 was transferred between a number of third parties. Meanwhile, on June 18, 1971, Continental recorded the grant deed it received from petitioner, creating a cloud on the title. To remove the cloud, on March 29, 1973, Continental without monetary consideration recorded a quitclaim deed to lot 15 in favor of Nelson and Victoria Goins. By various requests and motions, respondent attempted to obtain from petitioner and petitioner's *410 attorneys trust accountings respecting the trust purportedly created by Rudolph (sometimes hereinafter referred to as the Horstmier trust) for the years 1967 through 1977, inclusive. Although some pages purportedly from a trust accounting for the period January 1, 1967, to December 31, 1968, were introduced into evidence, the information contained on those pages is insufficient to permit us to make any findings of fact concerning the trust's income, losses, and deductions for the years 1967 and 1968. [8] No trust accountings or other evidence of the trust's total income, losses, and deductions for the years 1968 through 1977, inclusive, were furnished. Respondent determined that petitioner should have included the annuity payments he received *411 in income and therefore, increased petitioner's taxable income by $37,458.50 for 1968, $22,475.04 for 1970, $22,475.04 for 1971, $48,698.08 [9] for 1974, and $21,602.12 for 1975. Issue 3 - Purported Payments of Interest to Anglo Dutch
In 1968 Anglo Dutch loaned petitioner $30,000 at a 10-percent annual interest rate. (As previously indicated, Anglo Dutch was a California corporation owned by Margolis and one of his employees, Walter Joe.) The loan was arranged for petitioner by either Loughead or Breen. Petitioner lent the proceeds of the loan to Loughead at an 8-percent interest rate. When petitioner realized that he had loaned the money to Loughead at a lower interest rate than Anglo Dutch was charging him, he informed Loughead of this fact. Loughead reciprocated by increasing the interest rate on the Santa *412 Fe Arms note, which had purportedly been transferred by petitioner to ABC on May 1, 1967, for petitioner's annuity. On December 31, 1968, petitioner issued a check for $2,250 to Anglo Dutch.This payment is reflected on the partial system accounting, covering the period from November 25, 1968, to March 10, 1970, as an amount "paid in." On his income tax return for 1968, petitioner claimed a deduction for interest paid to Anglo Dutch in the amount of $2,250. On October 16, 1970, petitioner issued a check in the amount of $1,500 to Anglo Dutch. On December 1, 1970, petitioner made a payment of $31,000 to Anglo Dutch. Of the $31,000, $30,000 purportedly was designated as principal and $1,000 purportedly was designated as interest. On his income tax return for 1970, petitioner claimed a deduction for interest paid to Anglo Dutch in the amount of $2,500. A check for $47,500, dated November 30, 1970, was issued to petitioner by West Coast Financial Corporation (WCF herein), a California corporation then owned by Breen. (At the time of trial, Breen was president of WCF.) On December 1, 1970, (the same day as petitioner paid the $31,000 to Anglo Dutch), the check from WCF was deposited *413 by petitioner in his personal checking account. At trial petitioner was unable to recall the source of the $47,500. On accounting work sheets he maintained, petitioner placed a question mark next to an entry dated December 1, 1970, reflecting a receipt of $47,500. Also on December 1, 1970, petitioner purportedly repurchased his residence for $16,500 from Associated Arts, N.V., a Netherlands Antilles corporation (AA herein). Respondent disallowed the deductions claimed by petitioner for interest paid to Anglo Dutch on the grounds that petitioner had failed to establish that (1) an indebtedness was incurred, (2) the amounts deducted were paid, and (3) the transaction resulting in the indebtedness should be recognized for Federal income tax purposes. Issues 4 & 5 - Alleged "Repurchase" of Residence
A review of the records at the Fresno County recorder's office through September 1980 fails to show any conveyance by petitioner of the legal title to his residence, although petitioner was required to transfer it to ABC under the annuity agreement. (As previously mentioned, petitioner excepted the land on which his residence is situated from his conveyance of lots 1165 and 1166 of Bullard *414 Lands Irrigated Subdivision No. 7 to Continental.) Pursuant to the tax plan arranged for petitioner by his attorneys, petitioner was to lease his residence from ABC. On January 1, 1968, ABC purported to transfer petitioner's residence, as well as other properties, to UDL. Thereafter, petitioner and UDL entered into a lease agreement for petitioner's residence, whereby petitioner was required to pay rent of $1,500 per year. In a memorandum dated June 28, 1968, Breen informed Mary Jane Alexander (Mary Jane herein), an accountant who worked at Margolis's Los Angeles office, that the lease payments would "be credited to the Horstmier accounting." Lease payments of $1,500 and $3,000 received from petitioner by UDL on January 6, 1969, and January 13, 1970, respectively, were reflected on the system accounting as amounts "paid in." Although the purported date of the lease agreement petitioner entered into with UDL was January 1, 1968, the agreement was not executed until sometime after June 28, 1968. In the memorandum dated June 28, 1968, the Mary Jane, Breen stated that he was enclosing therewith two leases to be signed by UDL and returned to him for petitioner's signature.
In his 1970 *415 and 1971 Federal income tax returns, petitioner claimed deductions for depreciation of a building, purported to be acquired in January 1970 at a cost of $10,000 and to have a useful life of 25 years. Using this purported data and a straight-line depreciation method, depreciation on the building was calculated to be $400 per year. This $400 figure was reduced by $200 and $133.33 in 1970 and 1971, respectively, to reflect petitioner's personal use of the building in question. It is stipulated that the building for which depreciation deductions are claimed is petitioner's personal residence. Respondent disallowed the deductions claimed with respect to the depreciation of petitioner's residence with the explanation that petitioner had failed to establish-- 1) that the basis claimed for the property should be recognized as bona fide for tax purposes, or 2) that the amounts claimed represent an ordinary and necessary business expense in the event that the basis was established to be bona fide.
At trial petitioner could recollect nothing pertaining to a check he had written on December 1, 1970, to AA for $16,500. On a worksheet petitioner maintained, however, he designated the $16,500 *416 as paid to repurchase his residence. Of the $16,500, $15,000 was designated as principal and $1,500 was designated as interest. At trial petitioner testified that he only knew that he wanted to repurchase his house, but that he did not know how AA happened to have his house. As mentioned earlier, on the same date as petitioner paid $16,500 to AA for his residence, he also paid $31,000 to Anglo Dutch and deposited $47,500 that he had received from WCF to his personal checking account. On his Federal income tax return for 1970, petitioner deducted $750 of the $1,500 designated as interest, on his Schedule A, as an itemized deduction and the remaining $750, on his Schedule C, as an expense associated with a retail business petitioner conducted at his residence. Respondent disallowed the amounts deducted for failure to establish that (1) an indebtedness was incurred, (2) the amounts were paid, or (3) the transaction resulting in the indebtedness should be recognized for Federal income tax purposes. Issue 6 - Legal Fees
On or about January 1, 1968, Breen terminated his employment with Margolis' law firm and established his own law firm. Thereafter, Breen retained petitioner as a *417 client until the early or mid-seventies, when Margolis' firm resumed representation of petitioner. Breen was to receive as an annual fee an amount equal to one-third of the amount of petitioner's net savings resulting from the tax plan arranged by Breen and Margolis. Petitioner paid Breen monthly installments of $100 for a while and then monthly installments of $200. The amounts petitioner paid Breen from November 25, 1968, to March 10, 1970, are reflected on the partial system accounting as amounts "paid in." Under the tax plan arranged by Margolis and Breen, petitioner was to transfer substantially all his assets to ABC in exchange for the annuity. Petitioner consulted Breen respecting only the annuity, not other matters. Breen performed services on behalf of ABC for the Horstmier trust, including preparing trust accountings and planning memoranda. Petitioner, on his Federal income tax returns for 1970 and 1971, deducted attorney fees of $1,500 and $2,400, [10] respectively, as amounts paid regarding conservation of income-producing property. Respondent disallowed the deductions on the ground that petitioner had failed to prove (1) any liability was incurred for the legal expenses, *418 (2) the amounts claimed were paid or properly accruable, or (3) the amounts claimed represent ordinary and necessary expenses paid or incurred for the production or collection of income, or for the management, conservation, or maintenance of property held for the production of income. Issue 7 - Section 6653(a) Addition to Tax
Pursuant to section 6653(a), respondent added 5 percent of the underpayment for 1968, 1970, 1971, and 1974 to petitioner's taxes. Petitioner is neither an attorney nor a tax expert. He has a rudimentary understanding of trust principles. Petitioner's income tax returns for the years before us were prepared and filed by Sheldon P. Lewis & Co., a firm of certified public accountants. Those returns disclosed all of the transactions in issue in the present case. Although another employee of Sheldon P. Lewis & Co. prepared petitioner's tax returns, Sheldon P. Lewis (Lewis herein) took responsibility for the accuracy of petitioner's returns.Lewis, who has been a certified public accountant since 1949, had a professional *419 relationship with Margolis between 1961 and 1969. During this time, Lewis' firm performed accounting services for clients of Margolis. During their professional relationship, Lewis and Margolis had numerous telephone conversations and meetings. Although Lewis never saw the partial system accounting maintained for petitioner until two weeks before the trial of the present case, Lewis prepared approximately four system accountings for clients of Margolis. If Lewis, in preparing a system accounting, had a question as to whether an entity was a system entity (see p. 35, infra) he would ask Margolis. In connection with the preparation of petitioner's income tax returns, petitioners provided accounting work sheets prepared by him to Sheldon P. Lewis & Co. The work sheets reflected his cash receipts and disbursements for each taxable year. As noted earlier (under the heading for issues 1 and 2), Breen drafted the language on petitioner's returns asserting that petitioner was entitled to treat the exchange of his property for an annuity as an "open transaction" in which no gain would be realized until petitioner recovered the full basis of his property. Margolis' firm instructed Sheldon *420 P. Lewis & Co. to place such language on petitioner's income tax returns. Each year, petitioner's attorney reviewed petitioner's income tax return after it was prepared and also represented to Lewis that deductions claimed on petitioner's return resulting from transactions between petitioner and system entities were proper deductions. Additional Facts Relating to Issues (1) through (7)
To implement their tax planning, Margolis and his associates employed certain entities whose financial activities were largely determined by Margolis. These entities were known to Margolis' associates and employees as "system entities." Of the companies involved in the present case, ABC, Anglo Dutch, Associated Arts, and UDL are system entities. The system entities are collectively known as the "system." The "system accountings" maintained by Margolis and his associates showed the balances either owed by their clients to the system or owed by the system to their clients. A typical system accounting contains 4 columns. The column headings on a system accounting would vary depending on who prepared it. Usually, the first column would be entitled "Description" and contain a short explanation of each *421 transaction and the final column would show the "Balance," the difference between the total amount in the second column and the total amount in the third column. In some instances, interest was charged or credited on a system balance, depending on whether the client had a positive or negative balance. If a client was owed money by the system, such money could be made available for investments. The gains from those investments would inure to the client's trust or other entity used to represent his position relative to the system. If a client desired to receive money owed him by the system, it could be paid to him at the direction of Margolis. The partial system accounting prepared for petitioner and introduced into evidence treats the transactions discussed herein (together with certain other transactions) as follows: #231 HORSTMIER
DATE
DESCRIPTION
PAID OUT
PAID IN
BALANCE
11/25
ABC to A. Horstmier -
Dec. annuity
1,871.92
[11] (6,892. )
12/15
ABC to A. Horstmier -
Jan. 69
annuity (#14)
1,873.93
12/16
Horstmier to Breen -
prof. serv.
100.00
12/26
Loughead to ADC [12] -
Santa Fe Arms loan
payment - principal $250.07
- interest $628.61
878.68
12/31
A. Horstmier to ADC - interest
2,250.00
12/31
Credit interest on Bel Haven [13]
investment thru 12/31/68 at 7%
of $115,000.00
8,050.00
1968 Cost (4% of $9,887.11)
1,513.00
1968 Fees
3,319.00
(4,191.69)
1969
1/3
First Federal Savings & Loan
to ABC -
interest 4th quarter 68
187.50
1/3
Midland Savings & Loan to ABC -
interest 4th quarter 68
188.67
1/3
Guarantee Savings & Loan
to ABC -
interest 4th quarter 68
187.50
1/6
A. Horstmier to UDL -
Fresno land
rents
1,500.00
1/16
R. Loughead to ADC -
Santa Fe Arms loan
payment - principal $251.53
- interest $627.15
878.68
1/21
ABC to A. Horstmier -
February annuity
#15
1,872.92
2/4
Horstmier to Breen -
prof. serv.
200.00
2/13
R. Loughead to ADC -
Santa Fe Arms -
loan payment -
principal $253.02
- interest $625.66
878.68
2/20
ABC to A. Horstmier - March
annuity (#16)
1,872.92
3/7
R. Loughead to ADC -
Santa Fe Arms -
loan payment -
principal $254.48
- interest $624.20
878.68
3/24
ABC to A. Horstmier - April
annuity #17
1,872.92
4/3
Horstmier to Breen -
prof. serv
200.00
4/8
First Federal Savings & Loan
to ABC-
1st quarter 69 interest
188.66
4/8
Midland Savings & Loan ABC -
1st quarter 69 interest
188.67
4/10
R. Loughead to ADC -
Santa Fe Arms
loan payment -
principal $255.96
- interest $622.72
878.68
4/17
Guarantee Savings & Loan
to ABC -
1st quarter 69 interest
190.28
4/29
ABC to A. Horstmier -
May annuity
1,872.92
5/9
R. Loughead to ADC -
Santa Fe Arms
loan payment -
principal $257.45
- interest $621.23
878.68
5/19
ABC to A. Horstmier -
June annuity
1,872.92
6/6
Horstmier to Breen -
prof. serv.
100.00
6/11
R. Loughead to ADC -
Santa Fe Arms
loan payment -
principal $258.96
- interest $619.72
878.68
6/25
ABC to A. Horstmier -
July annuity
1,872.92
7/1
Guarantee Savings & Loan
to ABC -
2nd quarter 69 interest
188.68
7/1
First Federal Savings & Loan
to ABC -
2nd quarter 69 interest
188.78
7/9
R. Loughead to ADC -
Santa Fe Arms
loan payment -
principal $260.47
- interest $618.21
878.68
(5,769.71)
7/11
Midland Savings & Loan
to ABC -
2nd quarter 69 interest
188.67
7/29
ABC to A. Horstmier -
Aug. annuity
1,872.92
Horstmier to Breen -
prof. serv.
200.00
8/8
Loughead to ADC -
Santa Fe Arms
loan payment -
principal $261.99
- interest $616.69
878.68
8/26
ABC to A. Horstmier -
Sept. annuity
1,872.92
9/11
R. Louthead to ADC -
Santa Fe Arms
loan payment -
principal $263.51
- interest $615.17
878.68
9/29
ABC to A. Horstmier -
Oct. annuity
1,872.92
10/6
Horstmier to Breen -
prof. serv.
200.00
10/8
Guarantee Savings & Loan
to ABC -
3rd quarter 69 interest
188.68
10/8
First Federal Savings & Loan
to ABC -
3rd quarter 69 interest
188.78
10/8
Midland Savings & Loan
to ABC -
3rd quarter 69 interest
188.67
10/10
R. Loughead to ADC -
Santa Fe Arms
loan payment -
principal $265.05
- interest $613.63
878.68
10/16
Security Title Ins. Co.
to UDL -
proceeds from sale of
Horstmier
property (income $2,029.87 -
interest $12.51)
2,042.38
10/27
ABC to A. Horstmier -
Nov. annuity
1,872.92
11/12
R. Loughead to ADC -
Santa Fe Arms
loan payment -
principal $266.60
- interest $612.08
878.68
11/27
ABC to A. Horstmier -
Dec. annuity
1,872.92
12/12
R. Loughead to ABC -
Santa Fe Arms
loan payment -
principal $268.15
- interest $610.53
878.68
12/27
A. Horstmier to ADC -
interest
2,858.00
12/31
Credit for interest on
Bel Haven
investment for 1969
(7% of $115,000)
8,050.00
1969 Cost (4% of $10,877.50)
1,841.00
12/31
Horstmier to Breen -
prof. serv.
200.00
1969 Fees
3,887.00
(2,163.75)
1970
1/6
Guarantee Savings & Loan
to ABC -
interest 4th quarter 69
188.68
1/6
Midland Savings & Loan
to ABC -
interest 4th quarter 69
188.67
1/9
Loughead to ADC -
Santa Fe Arms
loan payment -
principal $269.72
- interest $608.96
878.68
1/13
Horstmier to UDL -
rental income on
Fresno property
3,000.00
1/13
A. Horstmier to UDL -
Fresno property
(Jack Samm's transaction)
580.00
1/23
First Federal Savings & Loan
to ABC -
interest 4th quarter 69
188.78
1/26
ABC to Horstmier -
Jan. annuity
1,872.92
1/26
ABC to Horstmier -
Feb. annuity
1,872.92
2/11
ABC to Horstmier -
March annuity
1,872.92
2/12
Loughead to ADC -
Santa Fe Arms
loan payment -
principal $271.29
- interest $627.39
878.68
2/15
Horstmier to Breen -
prof. serv.
300.00
3/10
Loughead to ADC -
Santa Fe Arms
loan payment -
principal $272.87
- interest $605.81
878.68
( 700.32)
*422 OPINION Issues 1 and 2 - The Trust and Annuity
At petitioner's request, his brother executed a power of attorney appointing Godfrey Johnson his lawful attorney in connection with the creation of a foreign situs trust (the Horstmier Trust) with ABC as trustee. On April 24, 1967, Godfrey Johnson, acting as the lawful attorney of petitioner's brother, executed an irrevocable trust instrument with ABC as trustee. Petitioner, petitioner's children, and petitioner's grandchildren were the named beneficiaries. One week after the trust instrument was executed, Godfrey Johnson, acting as petitioner's lawful attorney, executed an Annuity Agreement with ABC. Pursuant to the annuity agreement, petitioner was to transfer various assets to ABC for a fixed life annuity. The first two issues concern *423 what portion of the purported annuity payments, if any, received by petitioner in 1968, 1970, 1971, 1974 and 1975 are taxable to him. Respondent's primary argument is that the Horstmier trust and petitioner's purported transfer of property thereto in exchange for an annuity are devoid of economic reality and are to be disregarded for Federal income tax purposes. Thus, respondent contends that petitioner continued to exercise dominion and control over the property purportedly transferred and is taxable on the income therefrom. If the Horstmier trust and petitioner's transfer of property thereto are recognized for Federal income tax purposes then respondent makes two alternative arguments. First, he would have us characterize petitioner as the true grantor of the Horstmier trust and characterize the transfer by petitioner as a transfer in trust subject to a retained income interest under section 677, [14] *425 with the result that the trust's income is taxable to petitioner under section 671. [15] *426 Second, if petitioner's transfer of property is treated as being in exchange for a valid annuity, respondent contends that a portion of the payments in question is taxable under section 72, [16] *427 *424 in accordance with our decision in Estate of Bell v. Commissioner,60 T.C. 469 (1973). He asserts that petitioner's "investment in the contract" is the present value of an annuity of $1,872.92 per month for 16.9 years or $244,320.97, using the actuarial tables set forth in section 20.2031-7(f), Income Tax Regs. (based on a 3-1/2-percent interest factor). Dividing this figure by the "expected return" (16.9 X 12 X $1,872.92), respondent calculates the exclusion ratio to be 64 percent. Respondent contends that the excess of the value of the property transferred to the trust over the discounted value of the annuity must be deemed a gift, under Estate of Bell v. Commissioner,supra.
Petitioner contends that, in substance as well as in form, his brother created the trust in question, the trust had an independent trustee, and petitioner transferred property to the trust in exchange for an annuity. He further contends that given the recent decision of the Court of Appeals for the Ninth Circuit in LaFargue v. Commissioner,689 F.2d 845 (9th Cir. 1982), revg. in part and affg. in part 73 T.C. 40 (1979) (holding that absent *428 evidence that annuity payments are a disguise for transferring income of a trust to the grantor, the formal structure of a transaction as a sale or exchange for an annuity will not be ignored), respondent has no grounds upon which to base his argument that petitioner's transfer of property should be treated as a transfer in trust subject to a retained income interest. Finally, petitioner asserts that, in any event, no portion of the disputed payments is taxable under section 72. Because the fair market value of the assets transferred for the purported annuity ($379,829.62) equals approximately the amount petitioner would receive if he lives exactly as long as his actuarial life expectancy ($379,828.18), petitioner argues that his investment in the contract equals his expected return and a 100-percent exclusion ratio results. As petitioner asserts, it is well accepted that a taxpayer has "The legal right * * * to decrease the amount of what otherwise would be his taxes, or altogether avoid them, by means which the law permits." Gregory v. Helvering,293 U.S. 465, 469 (1935). However, Federal income tax consequences do not depend on the paper structure constructed, but on whether *429 the paper structure conforms with economic reality. A paper facade fabricated solely to avoid taxes, and without economic substance, will be disregarded. See, e.g., Markosian v. Commissioner,73 T.C. 1235, 1241 (1980); Furman v. Commissioner,45 T.C. 360, 364 (1966), affd. per curiam 381 F.2d 22 (5th Cir. 1967).We believe that, when all the facts of this case are considered collectively, petitioner cannot be treated as having exchanged his property for an annuity. The actual conduct of petitioner, his tax advisers, and ABC (an entity whose financial activities were largely determined by his tax advisers) indicates to us that the formal structure of petitioner's sale or exchange of property for an annuity was disregarded by them.Since they did not respect the formal structure of petitioner's sale of his property for an annuity, we see no reason to do so. [17] *430 Cf. Markosian v. Commissioner,supra at 1245. First, the circumstances surrounding the "transfer" of cash to ABC cast doubt on the genuineness of petitioner's sale of his properties in exchange for an annuity.Although under the terms of the Annuity Agreement petitioner was to assign, transfer, or set over to ABC $100,584.79, there is no persuasive evidence that such transfer in fact occurred.Letters dated May 11, 1967, and May 24, 1967, indicating that Continental was, at the request of ABC, transferring checks for $107,251.06 and $6,666.67, respectively, to Fischel (an attorney who was practicing law at the same firm as petitioner's tax advisers) were drafted over 2 months after their purported dates, pursuant to a memorandum from Breen (one of *431 petitioner's tax advisers). No checks for such amounts were actually received by Fischel. A letter sent to Fischel with a check in the amount of $100,584.39, which she did receive on or about May 12, 1967, only indicates that the check was sent in accordance with the instructions of Margolis, one of petitioner's tax advisers.No mention was made in the letter, or on the check, of any connection between the check and a trust of which ABC was trustee. Fischel did not disburse the proceeds of the check to ABC. Second, the backdating of documents relating to petitioner's transfer of his real property to Continental to be held for ABC casts further doubt upon the bona fides of petitioner's "sale." Although the Annuity Agreement provided that petitioner, contemporaneously with its execution on May 1, 1967, was to assign, transfer and set over to ABC the Gefvert Properties, Cambria Properties, and Horstmier Properties, none of the documents required to effectuate the assignment or transfer of such properties were extent until sometime well after May 1, 1967. [18] *432 Third, ABC failed to promptly have the grant deeds conveying the purported trust lands to Continental recorded. [19] See Furman v. Commissioner,45 T.C. 360, 365 (1966), affd. 381 F.2d 22 (5th Cir. 1967); Acuff v. Commissioner,35 T.C. 162, 175 (1960), affd. 296 F.2d 725 (6th Cir. 1961). *433 Cf. II A. Scott, Law of Trusts, sec. 175 at 1416 (3d ed. 1967). Fourth, petitioner's conduct with respect to the real property allegedly transferred to ABC suggests that he considered himself its owner, despite the legal transfer of its title. Following the transfer of the title of the Gefvert Properties to Continental, petitioner conveyed the Gefvert Properties by lease, received the rent therefrom, and paid the real property taxes thereon. Further, petitioner continued to pay real property taxes on lots 17 and 32 of the Horstmier Properties, granted easements thereon to the County of Fresno, and finally conveyed the title to such lots. [20] Additionally, although petitioner purportedly sold the Cambria Properties to ABC on May 1, 1967, when UDL subsequently sold lots *434 24, 25 and 26 of the Cambria Properties petitioner received the downpayment and payments on a deed of trust note received by UDL as partial consideration for those lots. In short, petitioner, unlike a seller, actually continued to control property "sold" to ABC, as trustee of the Horstmier "trust." Cf. LaFargue v. Commissioner,supra at 849. The perceived inconsistencies mentioned above between the annuity transaction's form and its substance might well be insufficient *435 to justify disregarding the form of the transaction in the context of another case. However, there is additional evidence in the instant case that the annuity transaction was merely a step in a tax avoidance scheme devised by petitioner's attorneys who largely determined the financial activities of the entities involved in the scheme. Specifically, after carefully examining the partial system accounting maintained for petitioner and all the testimony regarding the significance generally of the individual entries and the balance column on system accountings, we are compelled to conclude that the benefits of ownership of the personal property petitioner purportedly conveyed to ABC continued to inure to petitioner, by improving his financial position with respect to the system. It is not realistic to believe that the difference between the cumulative amounts in the paid in and paid out columns of the partial system accounting were calculated for "no purpose at all." Moreover, the testimony of Fischel, Lewis, and Ronald H. Adolphson (who, at the time of trial, had been employed by Margolis as an accountant for approximately 11 years), taken as a whole, support the conclusion that the *436 amounts recorded in the balance column of a system accounting show how much a client owes to, or is owed by, the system. Neither do we believe that the system accounting was maintained to determine "where the trust stands on an overall basis." If the system accounting had been maintained for that purpose, there would have been no reason for reflecting the following transactions on it: (1) petitioner's payments of "interest" to Anglo Dutch (see pp. 51-60, infra); (2) petitioner's payments of "rent" to UDL (see n.31, infra); and (3) petitioner's payments to Breen for legal services. The amounts petitioner paid Anglo Dutch for purported interest and UDL for purported rent were recorded as paid in on the system accounting and improved his financial position vis-a-vis the system. Likewise, and more importantly for purposes of resolving the instant issues, interest earned on the money petitioner purportedly transferred to ABC and payments received on the deed of trust note he assigned to ABC were treated as paid in on the system accounting and decreased the amount petitioner owed to the system. [21] In addition, when UDL received the final payment (of $2,042.38) in discharge of the principal *437 and interest due on the deed of trust note executed in its favor as partial consideration for lots 24, 25, and 26 of the Cambria Properties, the payment was recorded as an amount paid in on the system accounting and also decreased the amount he owed to the system. In our opinion, all the foregoing facts and circumstances are sufficient to support the conclusion that the creation of the Horstmier trust and petitioner's sale of his property thereto in exchange for an annuity were shams. In any event, if the Horstmier trust is recognized as a valid entity, then it is a trust for which petitioner must be treated as the owner under the grantor trust provisions. [22] Under the sham theory, petitioner is regarded as the owner of the property transferred to ABC and taxable, for each of the years in issue, on the income derived from the property. The amount that petitioner-grantor (see footnote 22) would be required to include in his income under the grantor trust provisions would similarly depend upon the amount of the Horstmier trust's income. *438 Section 1.671-3, Income Tax Regs. Here, petitioner failed to show the amount of the "trust" income for each year in issue. Thus, under either approach (applying the grantor trust provisions or the sham theory) petitioner would be taxable on the full amount of the annuity payments he received, as determined by respondent, but failed to include in his taxable income. Issue 3: Purported Payments of Interest to *439 Anglo Dutch
In his notice of deficiency to petitioner wherein he disallowed deductions claimed for interest paid to Anglo Dutch, respondent stated that petitioner had failed to establish that (1) an indebtedness was incurred, (2) the amounts deducted were paid, or (3) the transactions resulting in the indebtedness should be recognized for Federal income tax purposes. Section 163(a) allows a deduction for "all interest paid or accrued within the taxable year on indebtedness." Interest is defined as compensation for the use or forebearance of money. Deputy v. Dupont,308 U.S. 488 (1940). Indebtedness is defined as an unconditional and legally enforceable obligation for the payment of money. Autenreith v. Commissioner,115 F.2d 856, 858 (3d Cir. 1940), affg. 41 B.T.A. 319 (1940); Kovtun v. Commissioner,54 T.C. 331, 338 (1970), affd. per curiam 448 F.2d 1268 (9th Cir. 1971). Petitioner's reliance on brief on the form of the transaction is misplaced, [23] since the fact that a transaction is cast in the form of interest on indebtedness is not controlling for tax purposes. Instead, the focus on our inquiry is whether the substance of the transaction comports with its form. Knetsch v. United States,364 U.S. 361 (1960); *440 Beck v. Commissioner,74 T.C. 1534, 1552 (1980), affd. 678 F.2d 818 (9th Cir. 1982). On brief respondent primarily argues that petitioner's purported interest payments to Anglo Dutch cannot be regarded as payments for the use or forebearance of money, because the payments ultimately were received by the Horstmier "trust." In support of such argument, respondent relies upon testimony elicited from Breen on cross examination to the effect that the Horstmier trust would ultimately receive the $2,250 payment of interest to Anglo Dutch reflected in the paid in column of the partial system accounting. Respondent infers from Breen's testimony that all of petitioner's transactions with so-called "system entities" were actually transactions with the "system," which had no economic significance, but were designed solely to create tax deductions. Breen later, on redirect examination, attempted to explain his testimony elicited on cross examination as follows: (1) If petitioner had borrowed *441 money directly from the Horstmier trust and paid interest directly to it, a tax equal to 30 percent of the amount of interest would have been withheld. (2) To avoid the withholding of tax, Breen generally would arrange for a trust of which ABC was trustee to make a loan to a Netherlands Antilles corporation, such as World Minerals, N.V. or Alms, N.V. Thereafter, those loans proceeds would be lent on a back-to-back basis to Anglo Dutch and Anglo Dutch would, in turn, lend those loan proceeds to the "beneficiary." (3) The interest rate on the loan to Horstmier would have exceeded the interest rate on the loan to Anglo Dutch which, in turn, would have exceeded the interest rate on the loan to World Minerals, N.V. or Alms, N.V. (4) The object of the preceeding arrangement was "to achieve the highest net interest return" to the trust involved, by circumventing the withholding requirement. Breen's explanation of why "interest" paid by petitioner to Anglo Dutch ultimately would be received by the Horstmier trust is simply not convincing. First, we note that the amount reflected on the partial system accounting as paid on December 31, 1968, which Breen testified ultimately would be received *442 by the purported trust, is precisely the same as the amount of the check that petitioner issued to Anglo Dutch on December 31, 1968. Yet, under the plan allegedly used to circumvent the withholding requirements, the Horstmier trust would have received less than petitioner "paid" to Anglo Dutch.
Second, both petitioner and Breen have failed to explain why Anglo Dutch, rather than petitioner, would have been required to be indebted on the loan from the Netherlands Antilles corporation, in order for the 30 percent withholding requirement of section 1442 to be avoided, and we can see no reason why it was necessary that Anglo Dutch be indebted to the Netherlands Antilles corporation. Under the statutory framework set forth in the margin, [24] *443 nonresident alien individuals and foreign corporations are generally subject to a 30-percent tax on United States source interest income not effectively connected with a trade or business within the United States. However, the applicable provisions of a treaty with a foreign country often reduce the withholding tax. The treaty of the United States with the Netherlands Antilles provides, in effect, that generally interest on any form of indebtedness [25] derived from United States sources by a resident or corporation of the *444 Netherlands Antilles not engaged in a trade or business in the United States through a permanent establishment shall be exempt from United States tax, unless the recipient is a Netherlands Antilles corporation that directly or indirectly controls more than 50 percent of the entire voting power of a United States corporation paying the interest. See Article VIII of the 1948 "Convention Between the United States of America and the Kingdom of the Netherlands with Respect to Taxes on Income and Certain Other Taxes," 62 Stat. 1757, T.I.A.S. No. 1855, as extended to the Netherlands Antilles by the Protocol of June 15, 1955, 6 U.S.T. (Part 3) 3696, T.I.A.S. No. 3366. A protocol, which became effective on September 28, 1964, 15 U.S.C. (Part 2) 1900, T.I.A.S. *445 No. 5665, however, denies eligibility for exemption from the withholding tax on interest paid to any investment or holding company, corporation, limited partnership or other entity entitled to any of the special tax benefits provided under Article 13, Article 14, or Article 14A of the Netherlands Antilles' National Ordinance on Profit Tax of 1940, as in effect on September 1, 1963, or to substantially similar tax benefits granted under any law of the Netherlands Antilles enacted after such date. Nevertheless, the exemption continues to apply to any such entity if either: (1) The payer of the interest income is a United States corporation (a) which derives less than sixty percent of its gross income from certain forms of passive income, including interest [26] and (b) at least 25 percent of the stock of which is owned by such entity; or (2) All of the entity's stock is owned solely by (a) one or more individual residents of the Netherlands Antilles, (b) one or more individual residents of the Netherlands, or (c) one or more Netherlands' corporations. The *446 preceding provisions of the United States tax treaty with the Netherlands Antilles suggest only one reason why a United States corporation, rather than a United States individual, would be required to be indebted to a Netherlands Antilles corporation in order for the Netherlands Antilles corporation to be exempt from the withholding tax on United States source income: namely, to satisfy the 25-percent stock ownership requirement in those circumstances where it is applicable. However, as indicated earlier, we can see no reason why Anglo Dutch, rather than petitioner, would have been required to be indebted to a Netherlands Antilles corporation in order for the exemption from withholding tax to be operative. It is stipulated, and we have found as a fact, that, during the years at issue, Margolis and Walter Joe (an employee of Margolis) were the only shareholders of Anglo Dutch. Thus, no Netherlands Antilles corporation owned 25 percent or more of the stock of Anglo Dutch.Hence, if Breen's primary objective was, as he testified, to achieve the highest net return to the purported trust, the interposition of Anglo Dutch between petitioner, as a borrower, and a Netherlands Antilles corporation, *447 acting as a lender, would have been contrary to his objective. In short, we find that Breen's testimony on redirect examination is inconsistent with the relevant entry on the partial system accounting and the applicable provisions of the United States tax treaty with the Netherlands Antilles. We, therefore, consider Breen's testimony on this point unbelievable. It is clear that the "interest" petitioner paid to Anglo Dutch in fact inured to the benefit of the Horstmier "trust" or petitioner. Breen's testimony, as well as the testimony of Lewis and Fischel regarding the significance of the entries appearing on system accountings, support this conclusion. Petitioner had the burden of proving that the interest he paid to Anglo Dutch was actually interest on indebtedness, rather than a device for obtaining tax deductions for nondeductible transfers to the Horstmier "trust," as respondent contends. Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a).He has failed to carry that burden. [27] *448 Petitioner contends that the Internal Revenue Service has acted inconsistently by disallowing deductions he claimed for interest paid to Anglo Dutch although determining that, for the years 1967 through 1974, inclusive, Anglo Dutch was a personal holding company under section 542(a)(1) because more than 60 percent of its "adjusted gross income" consisted of interest. Petitioner argues that respondent's determination against Anglo Dutch is admissible in evidence as a "declaration against interest." [28] *449 Petitioner's contention concerning consistency must fail as a result of fatal procedural, factual, and substantive defects. See Malinowski v. Commissioner,71 T.C. 1120, 1128-1129 (1979). First, as a matter of procedure, petitioner has raised the argument of inconsistency too late, inasmuch as his pleadings fail to make any reference to it. Rules 34 and 39. See Malinowski v. Commissioner,supra.Second, petitioner has introduced no evidence from which we could make a finding of fact that the specific amounts in issue here were determined by the Internal Revenue Service to be interest income to Anglo Dutch. Third, and more importantly, it is well settled that the Commissioner may make inconsistent determinations in separate notices of deficiency. Estate of Goodall v. Commissioner,391 F.2d 775, 781-784 (8th Cir. 1968), affg. a Memorandum Opinion of this Court; L.C. Bohart Plumbing & Heating Co. v. Commissioner,64 T.C. 602, 615-616 (1975). The Commissioner, whose responsibility it is to protect the revenues, is not relegated to proceeding against only one taxpayer at the peril of a decision in favor of that taxpayer and the statute of limitations meanwhile running in favor of another taxpayer. Finally, petitioner asks us to use judicial notice in order *450 to apply collateral estoppel or res judicata and to find that (1) Anglo Dutch is engaged in the business of lending money, (2) Anglo Dutch is a bona fide corporation with its identity and interests separate from those of Margolis, (3) Anglo Dutch was not Margolis' alter ego, and (4) Margolis was not Anglo Dutch's alter ego. Petitioner relies on the findings of fact and conclusions of law reached by the Superior Court for the County of Ventura in Anglo Dutch Capital Co. v. Douglas R. McAvoy, as a basis for such findings here. We believe that for this Court to consider the findings of the Superior Court in that state proceeding as conclusive in the present case would be an abuse of the trial process.See C.F. Malanka and Sons v. Commissioner,T.C. Memo. 1979-187, affd. per unpub. opinion (3rd Cir. July 29, 1981).Respondent was not a party to the Superior Court case and had no opportunity to confront or cross examine the witnesses in that case. He also had no control over the litigation in that case. Accordingly, respondent cannot be bound by the findings on facts in issue in the state proceeding under the doctrines of res judicata or collateral estoppel. See Montana v. United States,440 U.S. 147, 153-155 (1979); *451 Commissioner v. Estate of Bosch,387 U.S. 456, 463 (1967).[29]
In accordance with the foregoing, we sustain respondent's determination on this issue. Issues 4 & 5: Alleged "Repurchase of Residence"
Petitioner's income tax returns for 1970 and 1971 indicate that a building, which is stipulated to be petitioner's personal residence, was purchased by him for $10,000 on January 1, 1970. Petitioner paid $16,500 to AA by a check dated December 1, 1970. On worksheets maintained by petitioner, the $16,500 was designated as being attributable to the purchase of his residence. Of the $16,500, $1,500 purportedly was a payment of interest and $15,000 purportedly was a payment of principal. Petitioner deducted $1,500 [30] *452 for the taxable year 1970 for interest purportedly paid to AA. He also claimed depreciation deductions on his personal residence of $200 and $266.67 for the taxable years 1970 and 1971, respectively. Petitioner based these depreciation deductions on his purported repurchase of his personal residence in 1970. Respondent argues that he purported repurchase of his residence by petitioner was a sham transaction devised to provide a basis for interest and depreciation deductions in the amounts claimed. As previously indicated, indebtedness in section 163(a) means an unconditional and legally enforceable obligation for the payment of money. Estate of Franklin v. Commissioner,64 T.C. 752, 761 (1975), affd. 544 F.2d 1045 (9th Cir. 1976); Kovtun v. Commissioner,54 T.C. 331, 338 (1970), affd. per curiam 448 F.2d 1268 (9th Cir. 1971). We agree with respondent that petitioner's purported "repurchase" of his residence was a sham and that, therefore, there was no valid, existing indebtedness within the meaning of section 163. Cf. Thompson v. Commissioner,66 T.C. 1024 (1976), affd. 631 F.2d 642 (9th Cir. 1980). We, accordingly, hold that petitioner is not entitled to the deduction in the amount of $1,500 claimed on his 1970 tax return for interest paid to AA. Petitioner's residence is located on a portion of lot 1165 of Bullard Lands Irrigated Subdivision No. 7 (the 4387 North West property herein) which was conveyed to him by his sister, Edna, in 1960. Our findings of fact indicate *453 that when petitioner and Rudolph transferred their respective interests in lots 1165 and 1166 of Bullard Lands Irrigated Subdivision No. 7 to Continental to convey legal title to a home developer, petitioner excepted from his grant deed the 4387 North West property. Although pursuant to the Annuity Agreement, petitioner was to transfer the east one-half of lot 1165 and an undivided two-thirds interest in the west one-half of lot 1165 to ABC, no deed conveying petitioner's interest in the 4387 North West Property was introduced into evidence. In addition, no deed was produced to substantiate the purported conveyance by AA to petitioner in 1970. Finally, it is stipulated that a review of the Fresno County recorder's records through September 1980 fails to show any conveyance of the 4387 North West property. In short, there is no evidence that petitioner ever transferred the legal title to the 4387 North West property and later reacquired it by purchase or otherwise. [31] *454 We next decide the related issue concerning the allowance of the depreciation deductions claimed in 1970 and 1971. Petitioner had the burden of proving that he in reality repurchased his residence in 1970 and that $15,000 of the $16,500 he paid to AA represented the "cost" of acquisition within *455 the meaning of section 1012. See Estate of Franklin v. Commissioner,supra at 761-762; Bixby v. Commissioner,58 T.C. 757, 781 (1972). For reasons discussed above in connection with the deductibility of the $1,500 payment to AA, we must conclude that petitioner has failed to meet that burden. Thus, we sustain respondent's determination on this issue. Issue 6: Legal Fees
We must next decide whether petitioner is entitled to deduct the $1,500 and $2,400 he purportedly paid for legal fees in 1970 and 1971, respectively. In his brief, petitioner argues that the purported legal fees are deductible if we find the following to be facts: legal services were performed, any liability to pay for such services was incurred, the disputed amounts were paid, and the amounts constitute ordinary and necessary expenses of a taxpayer in petitioner's situation. Respondent contends that petitioner paid the amounts in question simply to change the manner in which he held title to his existing property and that such amounts are, therefore, personal nondeductible expenses. Section 262. Nonbusiness, legal expenses are not deductible merely because they are ordinary and necessary expenses paid for legal *456 services. In order for such expenses to be deductible, they must be paid for a purpose designated in section 212. Since the petition in docket No. 9796-74 uses the words contained in sections 212(1) and (2), [32] we shall consider whether petitioner is entitled to deduct the amounts in dispute under such sections. [33] Petitioner's testimony is clearly inadequate to sustain his burden of proof on this question. Petitioner testified that he was paying Breen $100 *457 a month at first and then $200 a month for quite a while for being his attorney. When petitioner was pressed for details concerning the legal services that Breen, as his attorney, provided, petitioner replied "Well, he was giving me advice and everything, and he was also the go-between between me and the trust." Petitioner further testified that Breen had not told him what services he would receive for the $100 monthly fee. Breen's testimony concerning the services he performed for petitioner for the amounts in dispute is as inadequate as that of petitioner. His testimony fails to specify the services he performed for the particular amounts in issue. Breen testified that if "annuity" payments to petitioner were not timely, he would "raise hell with the trustee" and that he had prepared the "volumes" of "paperwork" introduced into evidence in the present case. Although Breen's efforts to secure receipt of the "annuity" payments for petitioner from ABC might be deductible under section 212(1) as expenses paid for the collection of income, the record fails to indicate that Breen prformed that service for any of the amounts in dispute. Upon consideration of the evidence (or lack *458 thereof), we hold that petitioner has failed to establish that the claimed legal fees were paid for the purposes specified in sections 212(1) and (2). Welch v. Helvering,290 U.S. 111 (1933); Professional Services v. Commissioner,79 T.C. 888, 917 (1982). Accordingly, respondent's determination is sustained. Additions to Tax Under Section 6653(a)
The final issue for decision is whether respondent correctly determined section 6653(a) additions to tax against petitioner for the taxable years 1968, 1970, 1971 and 1974. Section 6653(a) provides for an addition to tax if "any part of any underpayment * * * of any [income] tax * * * is due to negligence or intentional disregard of rules and regulations." Petitioner bears the burden of proving that the imposition of this addition is erroneous. Enoch v. Commissioner,57 T.C. 781 (1972); Marcello v. Commissioner,43 T.C. 168, 182 (1964), 380 F.2d 499 (5th Cir. 1967). Petitioner relied on experienced attorneys to formulate and implement a plan designed to minimize his tax liability. In addition, he employed a firm of certified public accountants to prepare his tax returns. The record indicates that petitioner's work sheets presented to *459 the accountants disclosed all the transactions in issue.
We do not think that petitioner's reliance in his tax advisers was nreasonable. In form, petitioner transferred his property to the Horstmier trust in exchange for an annuity, paid interest to Anglo Dutch, repurchased his residence from AA, and paid legal fees to Breen. That the actual steps taken by petitioner's attorneys were ingenious and complex is demonstrated by our lengthy Findings of Fact. Since petitioner was unsophisticated in taxation and the niceties of the law, he relied on his attorneys who advised him respecting the tax effects f the transfer of property in exchange for an "annuity" or who otherwise gave advice which resulted in the deficiencies. Under these circumstances, we conclude that the underpayments of tax were not due to petitioner's negligence or intentional disregard of rules and regulations. See Otis v. Commissioner,73 T.C. 671, 675 (1980), affd. 665 F. 2d 1053 (9th Cir. 1981); Hill v. Commissioner,63 T.C. 225, 251 (1974), appeal dismissed by agreement of the parties (9th Cir. 1976) and consolidated case Tenner v. Commissioner, affd. 551 F.2d 313 (9th Cir. 1977); Moorman v. Commissioner,26 T.C. 666, 680 (1956). *460 Respondent's reliance on Wesenberg v. Commissioner,69 T.C. 1005, 1015 (1978) is misplaced. In Wesenberg and its progeny, [34] unlike in the present case, no evidence was introduced to show that the taxpayers consulted with either an attorney or an accountant, who was knowledgeable in tax matters, as to the validity of trusts established as income-splitting devices. Decisions will be entered for the respondent. Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954 as amended and in effect during the years in issue and all references to Rules are to the Tax Court Rules of Practice and Procedure.↩
2. In petitioner's opening brief in this case, filed after trial and after the Court's order granting respondent's motion, petitioner's counsel requested an opportunity to replead the allegations embodied in paragraph 6 of the petitions to give petitioner "the best shot at getting a hearing." In granting respondent's motion, the Court concluded that petitioner had failed to state a claim upon which relief could be granted. In so concluding, the Court accepted as true the facts alleged in paragraph 6 of the petitions and in an affidavit of petitioner's counsel filed in opposition to the motion to strike. Consequently, permitting petitioner to reiterate the same allegations would be futile, since their disposition would not require the evidentiary hearing petitioner seeks.
3. The use of the following words and derivatives thereof in our findings of fact is for narrative convenience only following the form in which the various transactions herein were cast, and is not intended to indicate any legal conclusions concerning the actual substance or legal effect of the transactions: trust, annuity, convey, loan, interest, lease, rent, and transfer.↩
4. Although petitioner spells his surname Horstmier, his brother, sister, and mother spelled their surname Horstmeier. ↩
5. ABC was selected as trustee because Margolis' office maintained a working relationship with ABC. In addition, Loughead advised petitioner to use ABC as trustee.↩
6. Rudolph knows petitioner's daughter, Lois Farmer, because he bowled with her once. He also knows that Earl Horstmier is petitioner's son, but Rudolph and Earl Horstmier have "had very little to do with each other." At the time of trial, Rudolph had not seen petitioner's grandchildren "for years" and would not have recognized them if he saw them. As of 1967, Rudolph had seven children of his own.↩
7. One witness referred to petitioner's system accounting as being "partial," by which he meant that it covers only 1968 through 1970 and, with one exception, only cash transactions.↩
8. The pages introduced into evidence contain the following statements: Income for the year ending 31 December 1967 was $11,012.90 per attached Schedule D. Income for the year ending 31 December 1968 was $20,258.73 per attached Schedule E. The designated schedules, however, are not affixed to the pages in evidence. No attempt was made by petitioner to explain how the amounts represented as the income of the trust for 1967 and 1968 were derived.↩
9. As previously indicated, petitioner actually received annuity payments for the years 1970 and 1974 in the amounts of $20,602.12 and $48,696.08, respectively.On his tax returns for 1970 and 1974, he showed that he received annuity payments in such amounts, but elected to apply the amounts received against the basis of the property he transferred in exchange for the annuity.↩
10. During 1970, petitioner issued checks in the total amount of $1,500 to Breen. During 1971, he issued checks in the total amount of $2,400 to Breen.↩
11. The copy of petitioner's partial system accounting introduced into evidence fails to show the remainder of the designated amount, apparently as a result of an error in xeroxing. ↩
12. ADC represents Anglo Dutch. ↩
13. Bel Haven is a convalescent center located in Fresno, California, in which Loughead had an ownership interest. ABC, as trustee of the Horstmier trust, lent $115,000 with respect to Bel Haven.↩
14. Section 677 provides, in pertinent part, as follows: SEC. 677. INCOME FOR BENEFIT OF GRANTOR. (a) General Rule.--The grantor shall be treated as the owner of any portion of a trust, whether or not he is treated as such owner under section 674, whose income without the approval or consent of any adverse party is, or, in the discretion of the grantor or a nonadverse party, or both, may be-- (1) distributed to the grantor; (2) held or accumulated for future distribution to the grantor * * *. Section 332(a)(1) of the Tax Reform Act of 1969, Pub. L. 91-172, 83 Stat. 487, 599, amended paragraphs (1), (2), and (3) of section 677(a) by striking out "the grantor" each place it appears and inserting in lieu thereof "the grantor or the grantor's spouse," effective with respect to property transferred in trust after October 9, 1969. 15. Section 671 provides: SEC. 671. TRUST INCOME, DEDUCTIONS, AND CREDITS ATTRIBUTABLE TO GRANTORS AND OTHERS AS SUBSTANTIAL OWNERS. Where it is specified in this subpart that the grantor or another person shall be treated as the owner of any portion of a trust, there shall then be included in computing the taxable income and credits of the grantor or the other person those items of income, deductions, and credits against tax of the trust which are attributable to that portion of the trust to the extent that such items would be taken into account under this chapter in computing taxable income or credits against the tax of an individual. Any remaining portion of the trust shall be subject to subparts A through D. No items of a trust shall be included in computing the taxable income and credits of the grantor or of any other person solely on the grounds of his dominion and control over the trust under section 61 (relating to definition of gross income) or any other provision of this title, except as specified in this subpart. 16. SEC. 72. ANNUITIES; CERTAIN PROCEEDS OF ENDOWMENT AND LIFE INSURANCE CONTRACTS. (a) General Rule for Annuities.--Except as otherwise provided in this chapter, gross income includes any amount received as an annuity (whether for a period certain or during one or more lives) under an annuity, endowment, or life insurance contract. (b) Exclusion Ratio.--Gross income does not include that part of any amount received as an annuity under an annuity, endowment, or life insurance contract which bears the same ratio to such amount as the investment in the contract (as of the annuity starting date) bears to the expected return under the contract (as of such date). This subsection shall not apply to any amount to which subsection (d)(1) (relating to certain employee annuities) applies. (c) Definitions.-- (1) Investment in the contract.--For purposes of subsection (b), the investment in the contract as of the annuity starting date is-- (A) the aggregate amount of premiums or other consideration paid for the contract * * * (B) the aggregate amount received under the contract before such date, to the extent that such amount was excludable from gross income under this subtitle or prior income tax laws. (3) Expected return.--For purposes of subsection (b), the expected return under the contract shall be determined as follows: (A) Life expectancy.--If the expected return under the contract, for the period on and after the annuity starting date, depends in whole or in part on the life expectancy of one or more individuals, the expected return shall be computed with reference to actuarial tables prescribed by the Secretary. (B) Installment payments.--If subparagraph (A) does not apply, the expected return is the aggregate of the amounts received under the contract as an annuity.↩
17. In reaching this conclusion, we have carefully reviewed LaFargue v. Commissioner,689 F.2d 845 (9th Cir. 1982), revg. in part and affg. in part 73 T.C. 40 (1979), wherein the Ninth Circuit held that a transaction formally structured as a transfer of property to a trust in exchange for an annuity should be treated as an annuity transaction for tax purposes, despite certain "informalities" perceived by this Court in the administration of, and transfer of property to, the trust involved in LaFargue. See also Benson v. Commissioner,80 T.C. 789↩ (1983). Here, as will become apparent, the departures from the fundamental transaction contemplated by the Annuity Agreement are sufficient to conclude that the substance of the transaction failed to correspond with its form.
18. We note that ABC's failure to secure petitioner's transfer of legal title to the real properties when the Annuity Agreement was executed is a more serious violation of its duties as a "trustee" than the failure of the trustee in LaFargue v. Commissioner,supra, to give a transfer agent notice of the transfer of stock certificates. Although mere delivery of the stock certificates to the trustee-purchasers in LaFargue may have been insufficient to transfer legal title to the stock, it imposed an obligation upon the annuitant-seller to supply any necessary endorsement. Cal. Com. Code sec. 8307 (West 1964). Moreover, the trustee-purchasers were entitled to obtain any other formal requirements needed for registration of the transfer of the stock certificates. Cal. Com. Code sec. 8316 (West 1964). Here, in contrast, until the deeds conveying petitioner's properties were delivered and recorded, ABC ran the risk of losing the properties to a third party purchasing the properties in good faith. See Cal. Civ. Code sec. 1214↩ (West 1982).
19. We recognize that a bona fide unrecorded deed is valid as between the parties. Cal. Civ. Code sec. 1217 (West 1982). However, the failure to record the deeds enabled petitioner to continue dealing, as he did, with the lands as his own and is additional evidence of the lack of genuineness of the entire transaction. See Milbrew v. Commissioner,T.C. Memo. 1981-610↩, n. 20, on appeal (7th Cir., October 18, 1982).
20. Petitioner's self-serving testimony that he considered the proceeds from the sale of lots 17 and 32, which were deposited to his personal bank account, to be the trust's money is not convincing. Over 9 years had passed between the date of the sale of lots 17 and 32 and the date of submission of the present case to this Court. Yet, there is no evidence to indicate that the proceeds were ever remitted to the Horstmier trust. Moreover, although on direct examination petitioner claimed that the trustee knew he was holding the proceeds from the sale of lots 17 and 32 because he had so informed Loughead, when pressed on cross examination he testified that he did not know what relationship, if any, Loughead had to the trust.↩
21. In short, petitioner, unlike a seller, continued to share in the earnings of the above-described property. LaFargue v. Commissioner,supra↩ at 849.
22. Although petitioner's brother is the nominal settlor of the purported trust, petitioner must be regarded as the true settlor of the "trust." See Stern v. Commissioner,77 T.C. 614, 647 (1981).The following facts lead us to this conclusion: (1) the value of the property petitioner was to transfer to the trust ($379,829.62) was substantially greater than the amount puportedly transferred by his brother to the trust ($100); (2) the creation of the trust and the execution of the annuity agreement occurred close in time; (3) petitioner's attorneys prepared the necessary documents to fit his needs; and (4) the named beneficiaries are the natural objects of petitioner's bounty (see p. 8, supra). See Stern v. Commissioner,supra;Zmuda v. Commissioner,79 T.C. 714, 720-721↩ (1982).
23. Petitioner argues that the creation of an indebtedness is evidenced by his promissory note for $30,000 to Anglo Dutch and that his payments of interest are evidenced by entries in the books of Anglo Dutch.↩
24. Section 1441(a) requires that, in general, "all persons, in whatever capacity acting" withhold a tax equal to 30 percent of the items of income designated in section 1441(b), to the extent that any such items constitute United States source income "of any nonresident alien or * * * any foreign partnership." The items of income designated in section 1441(b) include interest. No tax is required to be withheld under section 1441(a) on interest income "which is effectively connected with the conduct of a trade or business" in the United States. Section 1441(c). Section 1442 provides that, in the case of foreign corporations subject to taxation under subtitle A of the Internal Revenue Code, "there shall be deducted and withheld at the source * * * on the same items of income as is provided in section 1441 * * * a tax equal to 30 percent thereof." Section 881 imposes a tax equal to 30 percent of the amount received from United States sources by a foreign corporation as interest, to the extent that the amount received "is not effectively connected with the conduct of a trade or business within the United States."↩
25. The rule stated above does not apply to interest from mortgages secured by real property situated in the United States. See Article V of the 1948 "Convention Between the United States of America and the Kingdom of the Netherlands with Respect to Taxes on Income and Certain Other Taxes" 62 Stat. 1757, T.I.A.S. No. 1855, as extended to the Netherlands Antilles by the Protocol of June 15, 1955, 6 U.S.T. (Part 3) 3696, T.I.A.S. No. 3366.↩
26. For this purpose, interest derived by a corporation principally engaged in the business of making loans is not taken into account.↩
27. It is interesting to note that petitioner, who purportedly was paying interest at the rate of 10 percent, initially was charging Loughead 8 percent interest.Had petitioner in fact been incurring interest on borrowed money, he undoubtedly would have realized from the beginning that he was paying more interest to Anglo Dutch than Loughead was paying him.
28. We note that petitioner's contention confuses declarations against interest with admissions by a party opponent. Compare Fed. R. Evid. 804(b)(3) with Fed. R. Evid. 801(d)(2). When a statement made by a party to the litigation is offered against such party by his opponent, is comes into evidence as an admission, Fed. R. Evid. 801(d)(2), and there is no need to determine whether the statement was against such party's interest at the time it was made.
29. Cf. Qualley v. Commissioner,T.C. Memo 1976-208↩.
30. As indicated in our Findings, petitioner deducted $750 of the $1,500 on his Schedule A and the remaining $750 on his Schedule C.
31. We believe that the record shows that the lease agreement which petitioner purportedly entered into on January 1, 1968, with UDL was merely another step in the tax avoidance scheme engineered by petitioner's attorneys who largely determined the financial activities of the entities involved in the scheme. Consequently, the lease agreement fails to support petitioner's argument that his residence was sold to ABC in 1967. First, the lease agreement was not executed until long after its purported date. Cf. Karme v. Commissioner,73 T.C. 1163, 1191 (1980), affd. 673 F.2d 1062↩ (9th Cir. 1982).Second, the "lease payments" made by petitioner to UDL, a system entity, on January 6, 1969, and January 13, 1970, were reflected on the partial system accounting as amounts "paid in" and thus, inured to the benefit of petitioner or the Horstmier trust. Finally, although Continental purportedly held the 4387 North West property for UDL under a holding agreement dated January 1, 1968, as discussed above, no evidence was introduced to establish that petitioner ever transferred the title to the property to Continental.
32. Section 212 provides: In the case of an individual, there shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year-- (1) for the production or collection of income; (2) for the management, conservation, or maintenance or property held for the production of income; or (3) in connection with the determination, collection, or refund of any tax. ↩
33. Petitioner has not claimed that he is entitled to deduct any portion of the disputed legal fees under section 212(3) and, in any event, the evidence as to the legal services rendered by Breen for such fees is insufficient to justify concluding that section 212(3) is applicable. See Merians v. Commissioner,60 T.C. 187, 190↩ (1973)
34. See, e.g., Brown v. Commissioner,T.C. Memo. 1982-253; Brownlee v. Commissioner,T.C. Memo. 1981-416; Mirenda v. Commissioner,T.C. Memo. 1980-252. Cf. Hoelzer v. Commissioner,T.C. Memo. 1982-6↩.