KARL L. DAHLSTROM AND CLARA J. DAHLSTROM, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Dahlstrom v. Commissioner
Docket No. 4860-89
United States Tax Court
T.C. Memo 1991-265; 1991 Tax Ct. Memo LEXIS 303; 61 T.C.M. (CCH) 2876; T.C.M. (RIA) 91265; June 11, 1991, Filed *303 Decision will be entered under Rule 155. Karl L. Dahlstrom and Clara J. Dahlstrom, pro se. Sheri Wilcox and David W. Johnson, for the respondent. SCOTT, Judge. SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION Respondent determined deficiencies in petitioners' income tax and additions to tax for the years and in the amounts as follows: Additions to tax,
Year
Deficiency
section 6661 [1]
1980
$ 403,471
--
1981
526,328
--
1982
113,571
$ 28,393
1983
24,937
6,234
Respondent determined the following additions to tax for petitioner Karl L. Dahlstrom only for the years and in the amounts as follows: Additions to tax,
Year
sec. 6653(b)
sec. 6653(b)(1)
sec. 6653(b)(2)
1980
$ 201,736
--  --
1981
236,164
--  --
1982
--  $ 56,786
*
1983
--  12,469
*
*304 The issues for decision are: (1) Whether documents entitled "trusts" [2] executed by petitioners are to be disregarded for tax purposes due to lack of economic substance and the income, interest, and capital gain reported as income of these trusts allocated to petitioners; (2) if the documents created trusts for tax purposes, whether the income received by the trusts is taxable to petitioners under the grantor trust provisions of sections 671-677; (3) whether petitioners are entitled to any deductions for the 1983 taxable year in excess of those allowed by respondent; (4) whether petitioners are liable for additions to tax under section 6661 for the taxable years 1982 and 1983; (5) whether petitioner Karl L. Dahlstrom (Mr. Dahlstrom) is liable for additions to tax for fraud pursuant to section 6653(b) for the taxable years 1980 and 1981, and pursuant to section 6653(b)(1) *305 and (2) for taxable years 1982 and 1983, and (6) whether assessment and collection of deficiencies in income tax and additions to tax from petitioners for the taxable years 1980, 1981, 1982, and 1983 is barred by the statute of limitations. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. The stipulation consists of voluminous facts, which were deemed stipulated pursuant to action on respondent's motion filed in accordance with Rule 91(f). While all these stipulated facts are found, we will recite *306 herein only those facts necessary to an understanding of our opinion. Petitioners, husband and wife, who at the time of the filing of the petition in this case resided in College Station, Texas, filed joint Federal income tax returns for the calendar years 1980, 1981, 1982, and 1983. Mr. Dahlstrom has a master's degree in education and physics; he has no formal education or training in the areas of law or taxation. Petitioners identified their occupations on their tax returns for the tax years 1980-83 as follows: Year
Mr. Dahlstrom
Mrs. Dahlstrom
1980
Consultant
Housewife
1981
Consultant
Housewife
1982
Consultant
Housewife/Secretary
1983
Consultant
Secretary
During the years in issue a tax shelter program was promoted and sold by Mr. Dahlstrom in the form of sales of memberships in an association called the American Law Association (ALA). During the years here in issue and at all other times relevant to this case Mr. Dahlstrom was president of the ALA. An individual who purchased a membership in the Association was entitled to attend 2- to 3-day seminars conducted by Mr. Dahlstrom on the tax shelter program at a fee of $ 6,000 and up. Mr. Dahlstrom conducted numerous *307 seminars during the years here in issue. Members attending the 2- to 3-day seminars were given a package of materials, which included preprinted forms for establishing trusts, preprinted minutes, trust certificates, and numerous excerpts from cases, legal commentary, newspaper articles, and other materials regarding trusts. The constitution of the ALA provides in part that "The Association is formed under common law and forms no legal entity distinct from that of its members." The materials distributed at the seminar were designed to help members create trusts. Mr. Dahlstrom explained in the seminars he conducted that use of the trusts would permit the member to avoid taxation on his income by various devices of transferring funds to the trusts and giving up ownership of the assets held by the trusts without giving up control of the same assets. Mr. Dahlstrom suggested that the member establish, at a minimum, three trusts. One foreign trust would be established to act as trustee of the two other foreign trusts. The member would name himself as trustee of the first trust and the first trust would be named trustee of the remaining two trusts. The end result of the appointment *308 of the trustees in this manner is that the member would remain in control of all the trusts. The member would then transfer his income or income-producing assets to the second trust in exchange for certificate units. The certificate units represent the beneficial interests in the trusts. The second trust, although a foreign trust with a foreign trustee, would be taxable in the United States because it carries on business (the member's) in the United States. In order to avoid paying any tax on the business income, trust three would be given the certificates of beneficial interest in trust two so that trust two could distribute essentially all of its net income to trust three, a foreign trust with no business in the United States, and reduce its income by the distribution. Because trust three is a foreign trust that is not engaged in business in the United States, it is not subject to tax on money it receives from trust two. The named creator of the trust is usually a straw man. The creator contributes no property to the trust and has no continuing relationship with the trust. The creator is responsible for naming the first trustee. The property is contributed to the trust *309 by the exchanger or transferor. In all cases the exchanger or transferor is the ALA member who is orchestrating the transactions. Beneficial interest in the trust is represented by trust certificate units. The trust certificates are held by the member or by a trust over which the member maintains control. The idea in establishing the trusts and in some instances additional domestic trusts is to shift all income earned by the member to a trust which can distribute it to a foreign trust not taxable in the United States. The members can transfer earnings to one of the trusts by paying consulting fees to the trust or purchasing items from the trust at a markup, or by payment for other items designated as rents or services to the trusts until all the member's income has been transferred to the trust. If after the foreign trust that is not taxable in the United States (trust three) has received as the holder of certificates of beneficial interest distribution of all the member's income which had been transferred by the member to the foreign trust that purportedly does business in the United States (trust two) the member wants some of the money back without paying taxes, he has trust *310 three lend that amount to another of his trusts and receive a demand promissory note for the amount lent. Trust three then transfers the demand note to the member as a gift. There would be no gift tax since trust three is a foreign trust and under section 2501 can make gifts of intangible property to a person in the United States without incurring gift tax. The member would demand payment on the note from the trust which had borrowed the money from trust three. The member would receive the note as a gift so it is not subject to income tax. Any intangible asset given by a foreign trust to a person in the United States is not subject to gift tax (sec. 2501), so other intangibles such as bank accounts, bonds or stocks could be used instead of a note as the gift by the foreign trust to the member. The final portion of the seminar was instruction in a taxpayer defense program if the taxpayer were subject to audit by the Internal Revenue Service. A form letter, referred to as the "Thirty Questions" letter, was provided to each member to be sent by him to the Internal Revenue Service examining agent posing 30 questions with the statement that it was necessary that these questions *311 be answered prior to any cooperation by the taxpayer. Representative examples of the questions posed include the following: 24. Please state and prove that taxpayer is not being subjected to an examination based on or for any political, ideological, harassment, pressure tactic or bad faith purpose, and is not being singled out for prosecution as an example to other taxpayers for any reason. 25. Please state and explain why the examination cannot and will not amount to an inquisition or arbitrary inquiry on the part of the tax examiner. 26. Please state and explain why I R Code Section 7605(b) does not apply to any examination of taxpayer where "No taxpayer shall be subjected to unnecessary examination or investigations, * * *." 27. Please state the exact methods used either past or present to gather information concerning taxpayer and whether information was gathered through the use of surveillance, phone-tapping, mail coverage, interviews, illegal entry, informers, spy or other.
Mr. Dahlstrom would further instruct those attending the seminar of the ALA on the "Procedure and Statements to be Used When IRS Allows Use of Tape Recorder and Attempts to Answer *312 Thirty (30) Questions." These procedures were as follows: 1. Request that each question be fully answered. Do not accept a partial answer or the answer, "not to my knowledge", or "that someone else in IRS would have answer." 2. Request that agent produce some evidence (memo, letter or other document) to fulfill the requirement of show and prove for each question. 3. Request that agent fully state and explain his answer in detail. If legal cite or authority is cited, request a copy of that legal cite or authority to determine if it is quoted fully, correctly and not taken out of context. 4. If agent still demands records, state the following for each demand: "I am here to show you my records, but you have refused to adequately answer the questions backed up with the proper evidence and authority, therefore I must protect my rights, which also includes the right to obtain a record of the adequate and complete answers to the questions." * * *
At the seminars Mr. Dahlstrom advised those attending to always have an examination of their returns take place at the office of respondent's agents and not at their home or place of business. Mr. Dahlstrom told those *313 attending the seminar that if they were not satisfied with the revenue agent's answers to their questions they could leave the agent's office, but might find it more difficult to have the agent leave their home or place of business. Mr. Dahlstrom also advised those attending the seminars that they should take to the agent's office only documents they wished the agent to see, but if the agent was on their premises he might see other documents. Prior to and during the years here in issue, petitioners established trusts, many of which were of the type set out in the tax shelter package and some on the same forms as provided therein. Petitioners established both domestic and foreign trusts. Petitioners were trustees, grantors and/or beneficiaries of trusts or were the trustees, grantors and/or beneficiaries of trusts which in turn were the trustees, grantors and/or beneficiaries of the other trusts. The following are the names of the trusts created by petitioners, which were being used during the years here in issue, showing whether the trust is a domestic (U.S.) trust or a foreign trust: ALA Dues Trust (U.S.), American Law Association (U.S.), Bavarian Trust (U.S.), Clear Gold Organization *314 (U.S.), Diamond Buyers Guild (not shown), Grand Trust Company (foreign --Turks and Caicos Islands), Information Services International (foreign -- Belize), International Clearing House (foreign -- Turks and Caicos Islands), International Sports Fishing Association (not shown), Jeanette Louis Trust (U.S.), Lark Enterprises (U.S.), North Fork Land Company (U.S.), Pan-Am Automobile Insurance Company (foreign -- Turks and Caicos Islands), Real Properties Company (not shown), Reales' Trust Company (foreign -- Turks and Caicos Islands), Rockwood Water District (U.S.), Southern Utilities Company (U.S.), Sunbelt Water Systems (U.S.), Trust Publications (U.S.), Val International (foreign -- Turks and Caicos Islands), and Yellow Rose Properties (U.S.). Petitioners maintained control over the assets held by all these trusts, either as trustee or as trustee of another trust which was trustee, and held the beneficial interest, either directly or indirectly, in each trust. In addition, petitioners had control over the bank account of Energy Farms, which they labeled as a partnership, and Sunbelt Utilities, Inc., and True Success of Texas, Inc., which they labeled as corporations. The trustees' *315 powers for each of the trusts with the exception of the Jeanette Louis Trust, [3] were broadly defined as follows: Trustees' powers shall be construed as general powers of citizens of the United States of America [or Belize or Grand Turk], to do anything any citizen may do in any state or country, subject to the restrictions herein noted. They shall continue in business, conserve the property, commercialize the resources, extend any established line of business in industry or investment, as herein specially noted, at their discretion for the benefit of this Trust, such as, viz.: buy, sell or lease land for surface or mineral rights, buy or sell mortgages, securities, bonds, notes, leases of all kinds, contracts or credits, of any form, patents, trademarks or copyrights; buy, sell, or conduct mail-order business, or branches thereof; operate stores, shops, factories, warehouses, or other trading establishments or places of business of any kind; construct, buy, sell, lease or rent suitable buildings or other places of business; advertise different articles or business projects; borrow money for any business project, pledging the Trust property for the payment thereof; hypothecate *316 assets, property, or both, or the Trust in business projects; own stock in, or entire charters of corporations, or other such properties, companies, or associations as they may deem advantageous. Resolutions of the Board of Trustees authorizing a special thing to be done shall be evidence that such act is within its power. Any one lending or paying money to the Board of Trustees shall not be obliged to see the application thereof, all funds paid into the treasury are and become a part of the corpus of the Trust.
Petitioners had signature authority over more than 60 bank accounts located in several banks under more than 20 names. Many of the accounts were in the names of the trusts of which petitioners were the trustees, grantors, and beneficiaries. Some of the checks written on the accounts were written with a "Copy-Not" pen, a pen that resisted microfilming by the bank. The *317 creators of the trusts, who served no function other than signing the documents and appointing the first trustee, included a taxi owner and tour guide in the Turks and Caicos Islands, a taxi and van service operator and tour guide in Belize, an associate of Mr. Dahlstrom's and Executive Vice President of the ALA, an employee of Trust Publications, and a person who sold the ALA trust materials in Alaska. During the years in issue, business receipts consisting of seminar fees, ALA dues, investment and other income (excluding interest) were deposited in accounts in the names of the following: ALA Dues Trust, American Law Association, Clear Gold Organization, Energy Farms, Lark Enterprises, North Fork Land Company, Real Properties Company, Southern Utilities Company, Sunbelt Utilities, Inc., Sunbelt Water Systems, True Success of Texas, Inc., Trust Publications, Yellow Rose Properties, and International Sports Fishing Assn. The total of such deposits for 1980 was $ 797,374.70, for 1981 was $ 947,032.98, for 1982 was $ 174,999.86, and for 1983 was $ 81,085.61. Most of those funds were transferred to other accounts. During the years in issue, interest was earned by the various bank *318 accounts and from certificates of deposit in the names of the trusts purchased with funds in various banks in the amount of $ 22,713.39 for 1980, in the amount of $ 44,686.23 for 1981, in the amount of $ 42,788.93 for 1982 and in the amount of $ 17,900.29 for 1983. Federal income tax returns, Forms 1041, were filed for the various trusts into which receipts for membership fees in the ALA were deposited for most of the years here in issue and a Form 1065 was filed for Energy Farms but no taxable or distributable income was reported on any of these returns since the returns either showed all income paid out for expenses or distribution of the funds to beneficial interest certificate holders. In December 1979 a document entitled "Consulting Agreement" was signed by Mr. Dahlstrom on behalf of the ALA, and Trust Publications and by Reales Trust Company by Mrs. Dahlstrom on behalf of Information Services International (ISI). This document provides that ISI would make available legal defense and research services to ALA and Trust Publications for a fee of $ 200,000 for 1979 and $ 600,000 for 1980. In 1978 a document entitled "Declaration of Contract" was executed by Mr. Dahlstrom on behalf *319 of Trust Publications and ALA and by Reales Trust Company by Mr. Dahlstrom on behalf of ISI in which Trust Publications and ALA agreed to pay annually $ 360,000 to ISI for knowledge, skill and know-how concerning trusts. Petitioners used the funds in the various trust accounts to purchase items for their own personal use. These items include: furniture, a 140-horsepower Johnson outboard motor; a 175-horsepower Johnson outboard motor; a 20-foot Buccaneer boat; a 16-foot Olympic Jon boat; a 20-foot Husky Jon Boat; a 20-foot Grande Bateau boat and prop; a Red River boat trailer; a 22-foot Sport-craft pleasure boat; a boat trailer; a Johnson motor; a 17-foot Boston Whaler pleasure boat; a 25-horsepower Evinrude motor; boat and motor title fees; a 20-foot Starfire pleasure boat, boat trailer and boat cover; a 1977 Winnebago motor home; a 1978 Brougham Model 250 motor home; three travel trailers; a 1984 BMW; a 1983 Chevrolet Suburban; a Jeep CJ-5; an Audi automobile; a 1984 Ford; a residence located at 1026 Rose Circle including lot, construction, pool, servant's quarters, furnishings, and landscaping; a residence located at 1009 Rose Circle; three parcels of land in Matagorda County; *320 two lots in the Holiday Harbor subdivision, concrete bulkhead and boat ramp, concrete slab and pilings for the house, and construction of a vacation home located at Holiday Harbor; a 155.35-acre tract; a 40-acre tract in Missouri-Texas Land and Irrigation Company subdivision, Hidalgo County, Texas; a 36.96-acre tract in Missouri-Texas Land and Irrigation Company subdivision; an 11-acre tract of land; a 10-acre tract in Fresh Farms subdivision in Hidalgo County; a 5.85-acre tract in Kelly Pharr subdivision in Hidalgo County; and a 1.19-acre tract in Kelly Pharr subdivision in Hidalgo County. Some checks were drawn on the various trust accounts payable to Mr. and Mrs. Dahlstrom. Petitioners did not have any vehicles registered in their own names during the years in issue. The title of each vehicle was in the name of one of the trusts. However, the vehicles were all driven by petitioners and members of their family. Petitioners and their family used the boats purchased by these trusts and used the home at 1026 Rose Circle as their residence when it was completed, moving from the home at 1009 Rose Circle where they had been living. Petitioners and their family used the vacation home *321 for their personal pleasure. During the taxable year 1981, the house located at 1009 Rose Circle, College Station, Texas, was sold. The sale proceeds of $ 90,000 were deposited in the Yellow Rose Properties account. The basis of the property was $ 66,000 and the capital gain from the sale was $ 24,000. During the taxable year 1982, the house located at 2001 Rockwood Drive, College Station, Texas, was sold. This house had at one time been petitioners' residence, but had been transferred to one of the trusts. The sale proceeds of $ 50,833.36 were deposited in the Yellow Rose Properties account. The basis in the property was $ 24,500 and the capital gain from the sale was $ 26,333.36. During the taxable year 1982, an installment sale of 17 water systems was made to Donald Sass for $ 98,000. The basis in the water systems was $ 69,309.46. The contract did not provide for interest. During 1982 Donald Sass made total payments of $ 14,145.98, of which imputed interest at 10 percent would be $ 2,222.27, capital gain would be $ 1,820.27 and return of capital would be $ 10,105.04. Donald Sass made payments of $ 12,804.15 in 1983, of which imputed interest at 10 percent was $ 2,162.93, *322 capital gain was $ 1,624.27, and return of capital was $ 9,016.95. During the taxable year 1982, the Clara Hills water system was sold to the Clara Hills Civic Association for $ 5,000. The basis in the Clara Hills water system was $ 2,500 and the capital gain from the sale amounted to $ 2,500. During the taxable year 1983, a lot in the Clara Hills subdivision was sold to Glenn Harry for $ 8,981.46. The basis in the lot was $ 4,500 and the capital gain was $ 4,481.46. Trust Publications purchased a parcel of land located in Brazos County, Texas (Brazos land), for $ 15,000 on July 26, 1977. In 1977, construction began on the ALA campus, located on the Brazos land. Lark Enterprises completed the campus construction for the ALA. Trust Publications conveyed the Brazos land to Lark Enterprises on November 1, 1977. Invoices and billing statements were issued from Parker Lumber Company to Trust Publications, ALA, and Lark Enterprises. The materials reflected on these invoices were used in continuing construction of the ALA building during the years in issue. The Parker Lumber Company invoices were paid with checks drawn on the Lark Enterprises account. During the years in issue, *323 no tax liabilities were reported on any returns filed by the trusts, the partnership, or the corporations, with the exception of Sunbelt Utilities, Inc., for 1982 when Sunbelt Utilities, Inc., reported a tax liability of $ 695. No returns were filed for Bavarian Trust, Diamond Buyers Guild, Jeanette Louis Trust, International Sports Fishing Association, Pan-Am Automobile Insurance Company, Reales Trust Company, Rockwood Water District, Val International and ALA for any of the years here in issue. No return was filed for ISI for 1980 and 1983; for 1981 and 1982 a Form 1040NR was filed showing no tax. There were other trusts for which returns were filed for some years and not for others. All the Forms 1041 either showed all receipts paid out as expenses or all income distributed to beneficiaries. On February 6, 1980, a grand jury investigation of Mr. Dahlstrom and others was commenced. Mr. Dahlstrom was indicted on June 2, 1981, for alleged violations of 18 U.S.C. section 371 and section 7206(2) of the Internal Revenue Code in the United States District Court, Western District of Washington, Seattle Division. He was convicted of conspiring to defraud the Government and aiding *324 and abetting the preparation and presentation of fraudulent income tax returns. On August 24, 1983, the United States Court of Appeals for the Ninth Circuit reversed the judgment of the United States District Court in United States v. Dahlstrom, 713 F.2d 1423 (9th Cir. 1983). Amounts from accounts styled in the names of the ALA, ALA Dues Trust, and Southern Utilities Company were used to pay costs and legal fees for the representation of Mr. Dahlstrom in the United States District Court and the United States Court of Appeals for the Ninth Circuit and in connection with the petition for certiorari to the Supreme Court. By a letter dated November 27, 1984, one of respondent's revenue agents informed petitioners that their income tax liabilities for the taxable years 1981, 1982, and 1983 would be examined and requested that petitioners produce specific records. Mr. Dahlstrom requested a postponement of the time for producing the records. The postponement was granted and on the postponed date, January 8, 1985, Mr. Dahlstrom came to the examining agent's office but refused to produce any records. By letter dated January 17, 1985, the revenue agent informed petitioners *325 that their income tax liability for the taxable year 1980 was also under examination and by letter dated January 23, 1985, the agent again requested that petitioners attend a conference with him and produce specific books and records. Petitioners again refused to produce the records requested. On January 30, 1985, the revenue agent served an administrative summons on Mr. Dahlstrom requesting specific records. Mr. Dahlstrom appeared pursuant to the summons but refused to produce the records requested claiming the examination was in violation of the Administrative Procedures Act and his Fifth Amendment rights. By a letter dated February 1, 1985, Mr. Dahlstrom replied to the agent's January 23, 1985, letter requesting production of documents with a letter which contained 30 "interrogatories" to be answered by the agent before petitioner would produce the requested documents. On January 30 and 31, 1985, the revenue agent also served administrative summonses on Homestead Savings Association, Community Savings and Loan Association, Citizens Bank, First Bank & Trust, First Bank of Snook, University National Bank, and City National Bank. On February 14, 1985, Mr. Dahlstrom filed a petition *326 to quash the seven summonses filed on the financial institutions. The United States filed its answer and counterclaim and thereafter the court dismissed the petition to quash with respect to all the financial institutions except two, Homestead Savings and City National Bank, which had advised the revenue agent that they did not have any records responsive to the summons. The Court also ordered the summons served on Mr. Dahlstrom enforced. Mr. Dahlstrom appealed the District Court's enforcement order to the United States Circuit Court of Appeals for the Fifth Circuit, which affirmed the District Court's order on November 2, 1987. Mr. Dahlstrom refused to provide the revenue agent with the documents requested in the summons served on him and he did not disclose to the revenue agent the names of the accounts, account numbers, or the location of the banks in which he had accounts. Mr. Dahlstrom also refused to disclose his Social Security number on the banks' signature cards. After obtaining the records summoned from the various financial institutions, the revenue agent issued summonses to various businesses identified from the bank records and examined certain public records. *327 Mr. Dahlstrom instructed some of the businesses not to comply with the agent's summonses. Petitioners received from the various trusts amounts denominated as "trustee fees" in amounts totaling $ 25,600 for 1980, $ 42,800 for 1981, $ 41,750 for 1982, and $ 48,100 for 1983. Petitioners reported these amounts and only these amounts on their joint Federal Income tax returns for the calendar years 1980, 1981, 1982, and 1983, respectively. On their 1983 income tax return, petitioners claimed a two-earner married couple deduction under section 221. Attached to the 1983 return is Schedule SE, Computation of Social Security Self-Employment Tax. Karl L. Dahlstrom is listed on the Schedule as the name of the self-employed person. The amount earned by Mr. Dahlstrom is stated as being $ 48,100 and the computation of the self-employment tax is based on that amount. There is no Schedule SE in the name of Mrs. Dahlstrom or W-2 Form attached with respect to Mrs. Dahlstrom. A Schedule W Deduction for a Married Couple When Both Work, is also attached to the 1983 joint Federal income tax return. On Schedule W, Mr. Dahlstrom is stated as having earned $ 41,200 and Mrs. Dahlstrom is stated as having *328 earned $ 6,900. In the notice of deficiency, respondent determined that the dues and seminar fees deposited to the trust accounts controlled by petitioners and the interest derived there from during the years in issue and the capital gains from property sales by the trusts were taxable as income to petitioners because the trusts were sham entities having no substance, purpose or economic reality other than the avoidance of Federal income taxes and were transactions entered into for the purpose of fraudulently evading tax. In the alternative, respondent determined that the income received by the trusts is taxable to petitioners as the grantors of the trusts. Respondent also disallowed the two-earner married couple deduction for 1983. Respondent used either the standard deduction or zero bracket amount in computing petitioners' tax liability, but on brief conceded that in 1982 and 1983 itemized deductions for real estate taxes and for personal sales taxes not claimed by petitioners on their return exceeded the zero bracket amount. Respondent also determined that petitioners were liable for the addition to tax under section 6661 for the years 1982 and 1983 and that Mr. Dahlstrom *329 was liable for the addition to tax for fraud under section 6653(b) for 1980 and 1981 and under section 6653(b)(1) and (2) for 1982 and 1983. OPINION Petitioners contend that the trusts they established were not shams but had economic validity. They argue that the proper test to be applied in determining the validity of a business organization is whether it either had a business purpose or carried on a business activity or a business for profit. Petitioners rely on the Court of Appeals' holding in Rice's Toyota World, Inc. v. Commissioner, 752 F.2d 89 (4th Cir. 1985), affg. in part and revg. in part 81 T.C. 184 (1983). They contend that the Court of Appeals in Rice's Toyota World, Inc. v. Commissioner, supra, held that the presence of a tax avoidance motive does not require the finding that there is no economic substance but that the presence of economic substance or business activity must be determined independently of tax avoidance motive. Petitioners then argue that the trusts here in issue engaged in business activities and therefore should be recognized for Federal income tax purposes. Respondent contends that *330 the trusts are shams for Federal tax purposes because petitioners maintained unrestricted control of the trusts through their roles as trustees, directly or indirectly, of the trusts. Respondent further contends that the trusts are shams for Federal tax purposes because petitioners remained in total control of and used for their own purposes the assets held in the name of the trusts. This personal utilization of the assets of the trusts includes paying petitioners' personal living expenses and other personal expenses with those assets. Respondent further contends that the seminar fees and related income were earned by Mr. Dahlstrom and that the various trust setups were merely an attempt at an anticipatory assignment by Mr. Dahlstrom of his income. Alternatively, respondent contends that the trusts are subject to the grantor trust provisions of sections 671-677. In response, petitioners argue that the trusts were not true trusts but were valid business organizations often referred to as Massachusetts business or common law trusts and accordingly should be classified as an association, taxable as a corporation for Federal tax purposes. It is well established that a taxpayer has *331 the legal right to minimize his taxes or avoid them totally by any means which the law permits. Gregory v. Helvering, 293 U.S. 465, 469, 79 L. Ed. 596, 55 S. Ct. 266 (1935). However, the right to minimize or avoid taxes does not include the right to have transactions that have no economic substance but are solely for the purpose of avoiding or evading taxes recognized for tax purposes. Zmuda v. Commissioner, 79 T.C. 714, 719-720 (1982), affd. 731 F.2d 1417 (9th Cir. 1984). If the purported transaction does not alter the economic relationship of the parties, we will look beyond the form in which the transaction is cast to determine whether the transaction has any substance. Zmuda v. Commissioner, supra at 720; Markosian v. Commissioner, 73 T.C. 1235, 1241 (1980); Furman v. Commissioner, 45 T.C. 360, 364 (1966), affd. per curiam 381 F.2d 22 (5th Cir. 1967). It has long been settled that an anticipatory assignment of income does not relieve the earner of the income from tax since income is taxed to the person or entity earning the income. Lucas v. Earl, 281 U.S. 111, 114-115, 74 L. Ed. 731, 50 S. Ct. 241 (1930); *332 Johnson v. United States, 698 F.2d 372, 374 (9th Cir. 1982). Petitioners misconstrue the holding of the Court of Appeals in Rice's Toyota World, Inc. v. Commissioner, supra. The Court of Appeals in that case affirmed the holding of this Court that a transaction which has no economic substance and is motivated by no business purpose other than obtaining tax benefits is a sham. Petitioners stress the statement of the Court of Appeals that "a transaction cannot be treated as a sham unless the transaction is shaped solely by tax avoidance considerations." Rice's Toyota World, Inc. v. Commissioner, supra at 92, citing Frank Lyon Co. v. United States, 435 U.S. 561, 583-584, 55 L. Ed. 2d 550, 98 S. Ct. 1291 (1978). However, the record here shows that all the transactions involved between petitioners and their trusts were shaped solely for tax avoidance purposes. The record here shows that the various transactions involved were primarily an attempt by Mr. Dahlstrom to assign to various trusts his income from conducting seminars and selling the related materials he had compiled to those attending the seminars. The record also shows *333 attempts by Mr. Dahlstrom to transfer his income from one trust account to another until income came into the hands of a foreign trust, resulting in no tax ever being paid on the income by anyone. The record shows that the entire scheme lacked economic substance and all the various transactions were shams. Petitioners argue that trusts can only perform through individuals and that Mr. Dahlstrom's earning of the income was as a representative of the trusts. The facts here present do not support petitioners' position. Mr. Dahlstrom deposited receipts from the seminar fees and related income to various accounts. Other than small amounts denominated "trustee fees" he received nothing from the trusts which he reported as income. The record supports respondent's position that Mr. Dahlstrom merely attempted to shift his income to trusts which, for Federal tax purposes, were sham transactions which lacked economic substance. Whether the trusts here involved lack economic substance and therefore are shams is a factual question to be decided on the basis of the facts here before the Court. United States v. Cumberland Public Service Co., 338 U.S. 451, 94 L. Ed. 251, 70 S. Ct. 280 (1950). Some *334 of the trusts here involved are identical to those we found in Zmuda v. Commissioner, supra, to be devoid of economic substance. The trusts did not alter taxpayers' economic relationship to the properties that were purchased through or transferred to the trusts. Some of the trusts here involved were identical and others similar to those discussed in other cases involving other ALA trusts of the type sponsored and distributed by Mr. Dahlstrom. See Sandvall v. Commissioner, 898 F.2d 455, 459 (5th Cir. 1990), affg. Memorandum Opinions of this Court, in which the Court stated with respect to the taxpayer's argument that they were singled out for "prosecution" because of their association with the ALA that: Legal smoke and mirrors, reams of paper, and strings of words will suffice no longer to evade or delay the payment of their fair share of federal income taxes. The time has come for them to join the rest of their fellow citizens at the annual income roundup.
See also Akland v. Commissioner, 767 F.2d 618 (9th Cir. 1985), affg. a Memorandum Opinion of this Court; Professional Services v. Commissioner, 79 T.C. 888 (1982); *335 Zmuda v. Commissioner, supra.[4]
We conclude in this case as in the above-cited cases involving ALA trusts developed and sponsored by Mr. Dahlstrom that we will look through the form and apply the tax law to the substance of *336 the transaction. In substance, petitioners are the owners of the property purchased by or transferred to the trusts and are taxable on the income, interest, and capital gain derived therefrom. Mr. Dahlstrom is the earner and owner of the income received from seminar fees and annual dues received from members of the ALA placed in various trust bank accounts. Lucas v. Earl, 281 U.S. 111, 114-115, 74 L. Ed. 731, 50 S. Ct. 241 (1930). Here, as in Sandvall v. Commissioner, supra, the "legal smoke," "mirrors," "reams of paper," and "strings of words" do not change the fact that in substance the income earned by Mr. Dahlstrom is his income and that he retained such control over the property transferred to the trusts that the property transferred is his and the income from the property is his income. The expenditures made with funds purportedly transferred to the trusts and the income therefrom were for the personal use of petitioners and their family or for payment of their personal expenses. For the year 1983, section 221 [5] permitted [6] a deduction of an amount equal to 10 percent of the lesser of $ 30,000 or the qualified earned income of the spouse with the lower qualified *337 earned income for the taxable year (two-earner married couple deduction). On their 1983 income tax return, petitioners listed Mrs. Dahlstrom's occupation as a secretary and Mr. Dahlstrom's occupation as a consultant and claimed a two-earner married coupled deduction. Respondent contends that all the income for the taxable year 1983 was earned by Mr. Dahlstrom and, therefore, that no deduction is permitted. Petitioners have not substantiated that Mrs. Dahlstrom was employed during the 1983 taxable year. Rather, on its face, their joint tax return suggests the opposite. Attached *338 to the return is Schedule SE, Computation of Social Security Self-Employment Tax. Karl L. Dahlstrom is listed on the Schedule as the name of the self-employed person. The amount earned by Mr. Dahlstrom is stated as being $ 48,100 and the computation of the self-employment tax is based on that amount. There is no Schedule SE in the name of Mrs. Dahlstrom or W-2 Form attached with respect to Mrs. Dahlstrom. A Schedule W, Deduction for a Married Couple When Both Work,is also attached to the joint tax return. Although Mr. Dahlstrom is stated as having earned $ 48,100 for purposes of self-employment tax, he is stated as having earned only $ 41,200 for purposes of the two-earner married couple deduction; the remaining $ 6,900 is attributed to Mrs. Dahlstrom. Nowhere on the 1983 return does it indicate from where Mrs. Dahlstrom earned the $ 6,900 or why it might have been taxed for self-employment tax purposes to Mr. Dahlstrom. Petitioners offered no evidence to support their contention that Mrs. Dahlstrom earned income and we find that she did not earn any during the 1983 taxable year. Because Mrs. Dahlstrom had no income for the taxable year, she has the lower qualified earned *339 income for the year. Accordingly, a section 221 deduction is improper. In his brief, respondent reallocated to petitioners some of the deductions claimed on the returns of the trusts. Respondent's determinations as to the amount of the allowable deductions are not challenged by petitioners and will therefore be sustained. Section 6661 provides for an addition to tax for a substantial understatement of Federal income tax liability. Respondent argues that petitioners are liable for additions to tax as a result of a substantial understatement pursuant to section 6661 for 1982 and 1983. Petitioners argue that, because there are no additional taxes due, the issue of additions is moot. An understatement is substantial if it exceeds the greater of 10 percent of the tax required to be shown on the return or $ 5,000. Sec. 6661(b)(1)(A). Petitioners reported on their 1982 joint Federal income tax return a liability of $ 10,937, and on their 1983 joint Federal income tax return a liability of $ 12,491. For 1982 and 1983, petitioners should have reported an additional $ 190,520.91 and $ 55,491.12 of income, respectively. It is clear that petitioners' understatement of tax liability *340 is substantial. With respect to understatements attributable to a tax shelter item, section 6661(b)(2)(C)(i) provides for a reduction of the amount of the understatement only in cases where there is or was substantial authority for the treatment of the item by the taxpayer and the taxpayer must also have "reasonably believed" that the tax treatment of the item was "more likely than not the proper treatment." Sec. 6661(b)(2)(B) and (C)(i). Section 6661(b)(2)(C)(ii) defines a tax shelter as: (I) a partnership or other entity, (II) any investment plan or arrangement, or (III) any other plan or arrangement, if the principal purpose of such partnership, entity, plan, or arrangement is the avoidance or evasion of Federal income tax.
Based upon the record before us, it is clear that the principal purpose of the Dahlstrom trusts scheme is the avoidance of Federal income tax. Our holding that the Dahlstrom trust scheme is a tax shelter, within the meaning of section 6661(b)(2)(C), is consistent with prior opinions of this Court and of the opinion of the Ninth Circuit in United States v. Dahlstrom, 713 F.2d 1423 (9th Cir. 1983), cert. denied 466 U.S. 980, 80 L. Ed. 2d 835, 104 S. Ct. 2363 (1984). *341 Petitioners have shown neither substantial authority for the treatment by them of the seminar fees and related income nor that they reasonably believed the tax treatment was more likely than not the proper treatment. Accordingly, we sustain the addition to tax under section 6661. For the years 1980 and 1981, section 6653(b) imposes a 50-percent addition to tax on an underpayment any part of which is due to fraud. For the years 1982 and 1983, section 6653(b)(1) imposes a 50-percent addition to tax on an underpayment any part of which is due to fraud and section 6653(b)(2) imposes an addition to tax of 50 percent of the interest due on the part of the underpayment due to fraud. Respondent has the burden of proving fraud by clear and convincing evidence. Rule 142(b); sec. 7454(a); Professional Services v. Commissioner, 79 T.C. 888, 929-930 (1982); Stone v. Commissioner, 56 T.C. 213, 220 (1971); Miller v. Commissioner, 51 T.C. 915, 918 (1969). When fraud is determined for more than 1 taxable year, respondent must show that some part of the underpayment is due to fraud for each taxable year in issue for the addition to *342 tax for fraud to be applicable to each such year. Otsuki v. Commissioner, 53 T.C. 96, 105 (1969). Fraud is defined as an intentional wrongdoing designed to evade tax believed to be owing. Estate of Pittard v. Commissioner, 69 T.C. 391, 400 (1977). Whether fraud exists with respect to a particular tax year is a factual question which must be resolved by an examination of the entire record. Mensik v. Commissioner, 328 F.2d 147, 150 (7th Cir. 1964), affg. 37 T.C. 703 (1962); Otsuki v. Commissioner, supra at 105. Since fraud can seldom be established by direct proof, the requisite intent may be inferred from a showing by respondent that the taxpayer's conduct was intended to conceal, mislead, or otherwise prevent the collection of taxes that the taxpayer knew or believed he owed. Stoltzfus v. United States, 398 F.2d 1002, 1005 (3d Cir. 1968). Since a taxpayer is entitled to use legal means to arrange his affairs so as to minimize his tax liability, Gregory v. Helvering, 293 U.S. 465, 79 L. Ed. 596, 55 S. Ct. 266 (1935), his mere attempting to legally reduce his tax liability *343 is not fraud. Neither is a mistake of law equivalent to fraud with intent to evade tax. Mayock v. Commissioner, 32 T.C. 966, 974 (1959). Here, however, Mr. Dahlstrom went far beyond legal bounds in attempting to avoid tax. His actions show that he was knowingly attempting to evade tax. The trusts established by Mr. Dahlstrom were without economic substance and were merely a scheme to evade tax. Petitioners failed to report income of $ 794.488.09, $ 958,519.21, $ 190,520.91 and $ 55,491.12 for the years 1980, 1981, 1982, and 1983 respectively. A consistent pattern of failing to report substantial amounts of income over a period of several years is persuasive evidence of fraud. Merritt v. Commissioner, 301 F.2d 484, 487 (5th Cir. 1962), affg. a Memorandum Opinion of this Court. The sole purpose of the trusts was to reduce or eliminate Mr. Dahlstrom's Federal income tax liability. The failure of Mr. Dahlstrom to pay tax on income that he earned, interest earned on money that he controlled, and capital gain from sales of properties over which he had control was not a mistake of law but a scheme of evasion of taxes. His fraudulent intent *344 is further evidenced by his refusal to cooperate with respondent's agents, his use of the Copy-Not pen, use of multiple bank accounts styled in numerous names, and his use of the taxpayer defense program. Further evidence lies in the fact that petitioners owned almost no assets in their own names, but rather all assets were held by the trusts they had established. Their prior and current residences were paid for and furnished with funds deposited to the trust accounts. All cars driven by petitioners and their daughter were titled in the names of trust organizations. Boats and motors Mr. Dahlstrom used were also owned in the names of trust organizations. He reported no income from the purchase with funds from the trust bank accounts of these assets for his personal use. His fraudulent intent further is evidenced by the fact that he alone decided what amounts he would report as trustee fee income on petitioners' income tax returns. Through his role as trustee of the trusts he used for his own purposes any property transferred to the trusts. Mr. Dahlstrom contends that the cases of United States v. Dahlstrom, 713 F.2d 1423 (9th Cir. 1983), and Dahlstrom v. Commissioner, 85 T.C. 812 (1985), *345 both hold that his setup of trusts to which assets were transferred and his stalling activities with respect to the investigation of his tax returns were legal. In United States v. Dahlstrom, supra, the Court of Appeals held that during the period covered by Mr. Dahlstrom's indictment the law with respect to foreign trusts similar to those he proposed to participants in his seminar was not settled. As shown by the cases that we have cited in holding that all income assigned by Mr. Dahlstrom to his trusts was taxable to him, the law was settled during the years 1980 through 1983. Also, the record shows that Mr. Dahlstrom used the income in the trust accounts for his own benefit. This fact was not shown in the criminal case considered by the Court of Appeals. For similar reasons the Ninth Circuit distinguished United States v. Dahlstrom, supra, from a case comparable to the present case in Akland v. Commissioner, 767 F.2d 618, 621-622 (9th Cir. 1985), affirming a Memorandum Opinion of this Court. See also United States v. Russell, 804 F.2d 571, 574 (9th Cir. 1986) and the concurring opinion *346 at 576. Our holding in Dahlstrom v. Commissioner, supra, insofar as here pertinent, merely holds that the record before the Court was not sufficient to show that there was no issue of material fact remaining in the case and therefore respondent's motion for summary judgment was denied. This holding in no way supports petitioner's contentions with respect to transactions shown by the evidence in this case. Petitioners' contention that assessment and collection of tax for the years here in issue is barred by the statute of limitations is without merit. When a false or fraudulent return is filed the tax may be assessed at any time. Sec. 6501(c)(1). Petitioners argue that false or fraudulent returns were not filed by them for the years 1980 through 1983 and that the 3-year statute of limitations bars assessment or collection of any tax for those years. We have found that respondent has satisfied his burden of showing by clear and convincing evidence that petitioner's use of the trust scheme was fraudulent for each of the years 1980 through 1983 and was used by Mr. Dahlstrom with an intent to evade tax. For the same reasons we concluded that Mr. Dahlstrom *347 was liable for the additions to tax for fraud, we conclude that petitioners' returns of each of the years 1980 through 1983 were false and fraudulent and therefore, assessment and collection of petitioners' tax for the years 1980 through 1983 is not barred by the statute of limitations. Sec. 6501(c)(1). Where fraud is shown on the part of one spouse to a joint return, the statute does not bar assessment and collection of tax as to either spouse because the joint return filed by them is fraudulent. Vannaman v. Commissioner, 54 T.C. 1011 (1970). Although it is not necessary to consider respondent's other arguments with respect to the statute of limitations, we do point out that the facts we have found show that aside from fraud, assessment and collection of tax from petitioners is not barred for any of the years here in issue. The due dates of petitioners' returns for the year 1982 and 1983 were April 15, 1983, and April 15, 1984, respectively, so that the 3-year statute of limitations after suspension for 1,082 days under the provisions of section 7609(e)(1) would not expire until March 2, 1989, and March 3, 1990. The notice of deficiency was mailed on December *348 22, 1988. Also it is clear that over 25 percent of the income due to be reported on petitioners' 1980 and 1981 returns was omitted so that the 6-year statute provided for in section 6501(e)(1) is applicable. This 6-year statute was likewise suspended for 1,082 days under section 7609(e)(1), so that the statute of limitations with respect to years 1980 and 1981 did not expire until March 2, 1990, and March 3, 1991, respectively. Because of respondent's concession on brief of some additional deductions to which petitioners are entitled for 1982 and 1983, Decision will be entered under Rule 155. Footnotes
1. Unless otherwise indicated, all statutory references are to the Internal Revenue Code as amended and in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.↩
*. Addition is equal to 50 percent of the interest computed on the deficiencies of $ 113,571 and $ 24,937 for the years 1982 and 1983, respectively.↩
2. The use of the following words and derivatives thereof in our findings of fact is for narrative convenience only, following the form in which the various transactions involved herein were cast, and is not intended to indicate any legal conclusions concerning the actual substance or legal effect of the transactions: "purchase," "sale," "loan," "note," "promissory note," "tax package," "trusts," "paid," "borrowed," "gift," "transfer," "contract," "liability," "entity," "business trust."↩
3. The Jeanette Louis Trust contains no identical recital of the trustees' powers, but also grants the trustees unrestricted authority.↩
4. See also Able Co. v. Commissioner, T.C. Memo 1990-500; Tatum v. Commissioner, T.C. Memo 1990-119; Tatum v. Commissioner, T.C. Memo 1988-579, affd. without published opinion 886 F.2d 1313 (5th Cir. 1989); Drager v. Commissioner, T.C. Memo 1987-483; Ripley v. Commissioner, T.C. Memo 1987-114; Estate of Yeoham v. Commissioner, T.C. Memo 1986-431, affd. without published opinion 826 F.2d 11 (5th Cir. 1987); Horstmier v. Commissioner, T.C. Memo 1983-409, affd. without published opinion 776 F.2d 1052 (9th Cir. 1985); Marvin v. Commissioner, T.C. Memo 1983-126↩.
5. Section 221 provided in part: (a)(1) In the case of a joint return under section 6013 for the taxable year, there shall be allowed as a deduction an amount equal to 10 percent of the lesser of -- (A) $ 30,000, or (B) the qualified earned income of the spouse with the lower qualified earned income for such taxable year.↩
6. Section 221 was repealed by section 131(a) of the Tax Reform Act of 1986, Pub. L. 99-514, 100 Stat. 2085, 2113.↩